# UNITED STATES *v.* LITTLE LAKE MISERE LAND CO., INC., ET AL.

No. 71–1459.   Argued January 15–16, 1973—Decided June 18, 1973

Burger, C. J., delivered the opinion of the Court, in which Douglas, Brennan, White, Marshall, Blackmun, and Powell, JJ., joined. Stewart, J., *post,* p. 605, and Rehnquist, J., *post,* p. 606, filed opinions concurring in the judgment.

*William Bradford Reynolds* argued the cause for the United States. With him on the briefs were *Solicitor General Griswold, Assistant Attorney General Frizzell, Deputy Solicitor General Wallace,* and *Edmund B. Clark.*

*Austin W. Lewis* argued the cause for respondents. With him on the brief was *Gene W. Lafitte.*

Mr. Chief Justice Burger delivered the opinion of the Court.

We granted the writ in this case to consider whether state law may retroactively abrogate the terms of written agreements made by the United States when it acquires land for public purposes explicitly authorized by Congress.

The United States initiated this litigation in 1969 in the United States District Court for the Western District of Louisiana, seeking to quiet title to two adjacent parcels of land in Cameron Parish, Louisiana, which the Government had acquired pursuant to the Migratory Bird Conservation Act, 45 Stat. 1222, 16 U. S. C. § 715 *et seq.*, as part of the Lacassine Wildlife Refuge.[1] Title to one parcel was acquired by the United States by purchase on July 23, 1937; to the other parcel by a judgment of condemnation entered August 30, 1939. Both the 1937 act of sale and the 1939 judgment of condemnation reserved to the respondent Little Lake Misere oil, gas, sulphur, and other minerals for a period of 10 years from the date of vesting of title in the United States.[2] The reser-

---

[1] The United States brought two separate suits for this purpose under 28 U. S. C. § 1345, which were consolidated by consent pursuant to Fed. Rule Civ. Proc. 42 (a).

[2] In *Frost-Johnson Lumber Co.* v. *Salling's Heirs*, 150 La. 756, 91 So. 207 (1922), the Louisiana Supreme Court declined to recognize a perpetual "mineral estate" in Louisiana lands, transferable independently of the overlying surface property. Instead, the Louisiana Supreme Court declared that "oil and gas in place are not subject to absolute ownership as specific things apart from the soil of which they form part," *id.,* at 858, 91 So., at 243, and that sale or reservation of mineral rights affords no more than a right to go on the land to search for and reduce to possession all minerals found. 2 A. Yiannopoulos, Louisiana Civil Law Treatise, Property § 99 (1967); H. Daggett, Mineral Rights in Louisiana § 1 (Rev. ed. 1949). See generally Hardy, The Birth of Louisiana Mineral Law, 16 Loyola L. Rev. 299 (1970). Since *Frost-Johnson*, "[s]ale and

vation was to continue in effect "as long [after the initial ten-year period] as oil, gas, sulphur or other mineral is produced . . . or so long thereafter as [respondents] shall conduct drilling or reworking operations thereon with no cessation of more than sixty (60) days consecutively until production results; and, if production results, so long as such mineral is produced." The deed and the judgment of condemnation further recited that at the end of 10 years or at the end of any period after 10 years during which the above conditions had not been met, "the right to mine, produce and market said oil, gas, sulphur or other mineral shall terminate . . . and the complete fee title to said lands shall thereby become vested in the United States."

The parties stipulated, and the District Court found, that as to both the parcels in issue here, no drilling, reworking, or other operations were conducted and no minerals were obtained for a period of more than 10 years following the act of sale and judgment of condemnation, respectively. Thus, under the terms of these instruments, fee title in the United States ripened as of 1947 and 1949, respectively—10 years from the dates of crea-

---

reservation of mineral rights have been almost consistently classified as servitudes." Yiannopoulos, *supra*, § 62, at 183; Daggett, *supra*, § 2.

"Prescription" or expiration of the remedy to protect a mineral servitude will occur at the end of 10 years from the date of creation, if the servitude is not maintained during that time in accordance with complex requirements for use or acknowledgment. The parties may not extend the 10-year period of prescription by advance agreement, see Art. 3460, La. Civ. Code Ann.; *Hightower* v. *Maritzky*, 194 La. 998, 1006–1007, 195 So. 518, 520–521 (1940). However, the parties are not barred from agreeing to a period of contractual prescription shorter than 10 years. Nabors, The Louisiana Mineral Servitude and Royalty Doctrines: A Report to the Mineral Law Committee of the Louisiana State Law Institute, 25 Tul. L. Rev. 155, 176–177 (1951).

tion. In 1955, the United States issued oil and gas leases applicable to the lands in question.

Respondents, however, continued to claim the mineral rights and accordingly entered various transactions purporting to dispose of those rights. Respondents relied upon Louisiana Act 315 of 1940, La. Rev. Stat. § 9:5806 A (Supp. 1973), which provides:

> "When land is acquired by conventional deed or contract, condemnation or expropriation proceedings by the United States of America, or any of its subdivisions or agencies from any person, firm or corporation, and by the act of acquisition, order or judgment, oil, gas or other minerals or royalties are reserved, or the land so acquired is by the act of acquisition conveyed subject to a prior sale or reservation of oil, gas or other minerals or royalties, still in force and effect, the rights so reserved or previously sold shall be imprescriptible."

Respondents contended that the 1940 enactment rendered inoperative the conditions set forth in 1937 and 1939 for the extinguishment of the reservations. The District Court concluded that the Court of Appeals' prior decision in *Leiter Minerals, Inc.* v. *United States*, 329 F. 2d 85 (CA5 1964), required resolution of this case in favor of respondents, notwithstanding that we had vacated the Court of Appeals' judgment in *Leiter Minerals* and remanded with instructions to dismiss the complaint as moot. 381 U. S. 413 (1965). The Court of Appeals affirmed, for the reasons stated in its *Leiter Minerals* holding. It rejected the Government's Contract Clause and Supremacy Clause objections on the authority of *United States* v. *Nebo Oil Co.*, 190 F. 2d 1003 (CA5 1951), and further rejected the Government's argument that Act 315 was unconstitutionally discriminatory against the United States. The Court of Appeals

observed "that the same principle applies to acquisitions by the State of Louisiana [La. Rev. Stat. § 9:5806 B], and that the act really does nothing more than place citizens of Louisiana in the same position as citizens of other states whose land has been purchased or condemned by the United States." 453 F. 2d 360, 362 (1971). We reverse.

## I

Litigation involving Act 315 began more than a quarter century ago. The *Leiter Minerals* case, upon which the Court of Appeals based its decision in this case, is only the principal holding in the area. The first case to arise involving Act 315, *Whitney Nat. Bank* v. *Little Creek Oil Co.*, grew out of a 1932 sale of mineral rights that specified a 10-year period of prescription. The surface property was conveyed to the United States in 1936, subject to the 1932 mineral sale, and in 1947 the question arose whether Act 315 of 1940 had the effect of extending indefinitely the servitude created by the 1932 sale. The Louisiana Supreme Court held that Act 315 of 1940 was fully applicable to the 1936 transaction—"not because there is anything in the terms of the statute to indicate that it was intended to have a retroactive application, but because of the general rule of law established by the jurisprudence of this court that laws of prescription and those limiting the time within which actions may be brought are retrospective in their operation." 212 La. 949, 958, 33 So. 2d 693, 696 (1947).[3] The court acknowledged the contention that if

---

[3] Louisiana law distinguishes between prescription and "peremption." The Louisiana Supreme Court has explained the distinction in the following terms: " 'When a statute creates a right of action, and stipulates the delay within which that right is to be executed, the delay thus fixed is not, properly speaking, one of *prescription*, but it is one of *peremption*. Statutes of prescription simply bar the

Act 315 were applied retroactively, it might be unconstitutional, but dismissed the constitutional issue without resolving it for failure to join the United States, a necessary party.

*Whitney Bank* set the stage for the first federal court test of Act 315, as construed to have retroactive application, in *United States* v. *Nebo Oil Co., supra,* aff'g 90 F. Supp. 73 (WD La. 1950). There the United States brought suit against Nebo Oil (the successor to the 1932 mineral purchaser of the *Whitney Bank* case) to secure a declaratory judgment that the United States owned the acreage it purchased in 1936 subject only to the 10-year rule of prescription specified at the time of the original 1932 sale of mineral rights. But the Court of Appeals upheld the application of Act 315 to the previously consummated transaction, stressing that reversionary estates are unknown in Louisiana law and that, as a result, the United States in 1936 took "nothing more than a mere expectation, or hope, based upon an anticipated continuance of the applicable general laws . . . . [This] mere expectancy . . . cannot be regarded as a vested right protected by the Constitution." 190 F. 2d, at 1008–1009.[4]

remedy. Statutes of peremption destroy the cause of action itself. That is to say, after the limit of time expires the cause of action no longer exists; it is lost.'" *Brister* v. *Wray Dickinson Co., Inc.,* 183 La. 562, 565, 164 So. 415, 416 (1935), cited in *United States* v. *Nebo Oil Co.,* 90 F. Supp. 73, 80 (WD La. 1950). Because statutes of prescription are considered "remedial" the Louisiana courts have generally held that such statutes are applicable to causes of action which arose before the statute was enacted. *United States* v. *Nebo Oil Co., supra,* at 81–82, and cases cited.

[4] The Court of Appeals also emphasized that officials of the Department of Agriculture had represented to the Government's vendor that "the prescriptive provisions of the Louisiana Civil Code would not apply to lands sold to the United States for national forest purposes." 190 F. 2d 1003, 1005. The Court of Appeals noted that the

In the *Leiter Minerals* litigation, retrospective application of Act 315 to a detailed, conditional mineral reservation was in issue for the first time. Leiter Minerals, Inc., succeeded to the interests of the Leiter family, which in 1938 had sold a substantial tract in Plaquemines Parish, Louisiana, to the United States. Leiter's federal sale was subject to a mineral reservation in Leiter's favor, providing in essence that the reservation would be extended for five years beyond its initial 10-year duration whenever commercially advantageous mineral extraction had occurred during 50 days of a defined period.[5] At the expiration of any period during which the conditions for extension had not been met, the right to mine would terminate "and complete fee in the land becomes vested in the United States." The mineral reservation expired by its own terms; the Government granted a valuable mineral lease; and Leiter invoked Act 315 to support its claim to a servitude of continuing duration.

After a false start in the Louisiana courts, the ensuing litigation found its way into a federal forum. The United States sued in the Eastern District of Louisiana to quiet title and to enjoin the concurrent state court proceedings initiated by Leiter. The Court of Appeals affirmed an injunction granted by the District

---

price paid by the Government did not reflect the value of any mineral rights and that the vendor would not have agreed to the land sale absent the Government's representation that Louisiana prescriptive law would not apply. *Id.*, at 1006.

[5] The initial duration of the reservation was 10 years. If mineral operations took place for "an average of at least 50 days per year" during the final three years of the specified term, the servitude would be extended for an additional five-year period, but only with respect to "an area of twenty-five acres of land" around each well or mine producing or being drilled at the "time of first extension." Additional five-year extensions could be obtained "from time to time" to permit completion of active drilling operations.

Court,[6] and this Court agreed, but remanded to the Court of Appeals with instructions to secure an authoritative construction of Act 315 before proceeding to the difficult constitutional issues in the case. *Leiter Minerals, Inc.* v. *United States,* 352 U. S. 220, 229 (1957).[7]

Adhering to the terms of the remand, Leiter sought a declaratory judgment in the Louisiana courts, which expressed some continuing doubt over the breadth of their responsibility for resolving the *Leiter* controversy on its own facts. Ultimately, the Louisiana Supreme Court took jurisdiction of the case and rendered a declaratory judgment limited to general elucidation of Act 315, without applying the Act to the specific terms of the Leiter mineral reservation itself. *Leiter Minerals, Inc.* v. *California Co.,* 241 La. 915, 132 So. 2d 845 (1961). The Louisiana Supreme Court expressed its conclusions as follows:

> "First, that if the reservation in the Leiter deed is construed as establishing a mineral servitude for a definite, fixed, and specified time which has elapsed, then Act 315 of 1940 is not applicable and cannot be constitutionally applied; and second, that if the reservation is construed as not establishing a servitude for a fixed, definite and certain time, and if

---

[6] *Leiter Minerals, Inc.* v. *United States,* 224 F. 2d 381 (CA5 1955), aff'g 127 F. Supp. 439 (ED La. 1954).

[7] The 1957 remand was in effect a remand with instructions to abstain. It contemplated state court elucidation of various uncertainties surrounding Act 315, before this Court would attempt "to decide their relation to the issues in the case." We do not, therefore, understand the respondents' suggestion, echoed by MR. JUSTICE STEWART, that the 1957 remand foreshadowed final resolution of the *Leiter Minerals* controversy through state law.

Indeed, the Court's opinion stated that "[i]t need hardly be added that the state courts . . . can decide definitively only questions of state law that are not subject to overriding federal law." 352 U. S. 220, 229–230.

it is decided that the provisions of the reservation show that the parties were stipulating for a period of contractual prescription for the conditional extinguishment of the mineral servitude created, then Act 315 of 1940 is applicable and constitutional." *Id.,* at 942, 132 So. 2d, at 854–855.

Recognizing that "the interpretation of this reservation is for the United States courts, and not for us in this proceeding," *id.,* at 930, 132 So. 2d, at 850, that court nevertheless hinted broadly that it viewed the Leiter reservation as one establishing a reservation for an indefinite period of time, and thus one subject to retroactive application of Act 315. See *id.,* at 936, 938, 132 So. 2d, at 852, 853.

The parties then returned to federal court. The District Court held that the mineral reservation in the Leiter deed created a mineral servitude for a fixed period and that, under the terms of the Louisiana Supreme Court's declaratory ruling, as a matter of state law the reservation was not affected by Act 315. 204 F. Supp. 560 (ED La. 1962). The Court of Appeals reversed. It rejected the Government's contention that federal law controlled the rights of the United States under the reservation, and held, instead, that those rights were to be governed by Louisiana law. The Court of Appeals believed that the Louisiana Supreme Court had viewed Leiter's servitude as "one of indefinite duration" and it agreed with that view. Under Louisiana law, therefore, the reservation "provide[d] for a contractual prescription for the conditional extinguishment of the mineral servitude which was rendered inoperative by [Act 315]." 329 F. 2d, at 93. As to the Government's contention that the Act, as so construed, unconstitutionally impaired the obligation of contract, the Court of Appeals concluded that the dis-

cussion of that matter in its prior decision in *Nebo Oil,*
*supra,* and in the Louisiana Supreme Court's *Leiter* opin-
ion, made it "unnecessary further to labor" the point.
*Id.,* at 94.   Judge Gewin dissented.   On being advised by
the parties that the case had been settled, we granted cer-
tiorari, vacated the judgment of the Court of Appeals, and
remanded the cause to the District Court with instructions
to dismiss the complaint as moot.   381 U. S. 413 (1965).

## II

The essential premise of the Court of Appeals' decision
in the *Leiter Minerals* case was that state law governs
the interpretation of a federal land acquisition author-
ized by the Migratory Bird Conservation Act.   The
Court of Appeals did not set forth in detail the basis
for this premise,[8] but that court's opinion seems to say

---

[8] In *Leiter Minerals,* the Court of Appeals stated that, although
"Congress could make federal law applicable, . . . it had no in-
tention to do so when it merely authorized the contract by which
the United States acquired the [Leiter] property."   The Court of
Appeals expressed the view that "[s]tate law must govern in the
absence of a federal statute," and in support of its view it cited
*Swift* v. *Tyson,* 16 Pet. 1, 18 (1842).   Later in its opinion, the
Court of Appeals stated that "since the United States had the
right to invoke federal jurisdiction (28 U. S. C. § 1345), the ultimate
responsibility for the interpretation of the reservation rests upon
the federal courts.   That interpretation, however, must be in accord-
ance with State law . . . ."   329 F. 2d 85, 90, 91.   From these
statements, it appears that the Court of Appeals considered that
the interpretation of the *Leiter* agreement was governed by state
law (applied of its own force), with the role of the federal courts con-
fined to interpretation of state law "in accordance with State law"
as laid down by the highest courts of the State.   Possibly, though,
the Court of Appeals thought that the choice of applicable law
was itself a question of federal law ("ultimate responsibility . . .
rests upon the federal courts . . .") but that in the general
context of this case, involving real property, state law should be
applied through "borrowing."

that state law governs this land acquisition because, at bottom, it is an "ordinary" "local" land transaction to which the United States happens to be a party. The suggestion is that this Court's decision in *Erie R. Co.* v. *Tompkins,* 304 U. S. 64 (1938), compels application of state law here because the Rules of Decisions Act, 28 U. S. C. § 1652,[9] requires application of state law in the absence of an explicit congressional command to the contrary. We disagree.

The federal jurisdictional grant over suits brought by the United States is not in itself a mandate for applying federal law in all circumstances. This principle follows from *Erie* itself, where, although the federal courts had jurisdiction over diversity cases, we held that the federal courts did not possess the power to develop a concomitant body of general federal law. Mishkin, The Variousness of "Federal Law": Competence and Discretion in the Choice of National and State Rules for Decision, 105 U. Pa. L. Rev. 797, 799 (1957). It is true, too, that "[t]he great body of law in this country which controls acquisition, transmission, and transfer of property, and defines the rights of its owners in relation to the state or to private parties, is found in the statutes and decisions of the state." *Davies Warehouse Co.* v. *Bowles,* 321 U. S. 144, 155 (1944). Even when federal general law was in its heyday, an exception was carved out for local laws of real property. *Swift* v. *Tyson,* 16 Pet. 1, 18 (1842); see *Kuhn* v. *Fairmont Coal Co.,* 215 U. S. 349, 360 (1910). Indeed, before *Erie R. Co.* v. *Tompkins, supra,* this Court's opinions left open the possibility that even "the United States, while protected by the Constitution from

---

[9] "The laws of the several states, except where the Constitution or treaties of the United States or Acts of Congress otherwise require or provide, shall be regarded as rules of decision in civil actions in the courts of the United States, in cases where they apply."

discriminatory state action, and perhaps certain other special forms of state control, was nevertheless governed generally in its ordinary proprietary relations by state law." Hart, The Relations Between State and Federal Law, 54 Col. L. Rev. 489, 533 (1954). See, *e. g., Mason* v. *United States,* 260 U. S. 545, 558 (1923).

Despite this arguable basis for its reasoning the Court of Appeals in the instant case seems not to have recognized that this land acquisition, like that in *Leiter Minerals,* is one arising from and bearing heavily upon a federal regulatory program. Here, the choice-of-law task is a federal task for federal courts, as defined by *Clearfield Trust Co.* v. *United States,* 318 U. S. 363 (1943). Since *Erie,* and as a corollary of that decision, we have consistently acted on the assumption that dealings which may be "ordinary" or "local" as between private citizens raise serious questions of national sovereignty when they arise in the context of a specific constitutional or statutory provision; particularly is this so when transactions undertaken by the Federal Government are involved, as in this case.[10] In such cases, the Constitution or Acts of

---

[10] This is not a case where the United States seeks to oust state substantive law on the basis of "an amorphous doctrine of national sovereignty" divorced from any specific constitutional or statutory provision and premised solely on the argument "that every authorized activity of the United States represents an exercise of its governmental power," see *United States* v. *Burnison,* 339 U. S. 87, 91 and 92 (1950); *United States* v. *Fox,* 94 U. S. 315 (1877). *Burnison* and *Fox* stand at the opposite end of the spectrum from cases where Congress explicitly displaces state law in the course of exercising clear constitutional regulatory power over a particular subject matter. See, *e. g., Sunderland* v. *United States,* 266 U. S. 226, 232–233 (1924) (United States may displace Oklahoma law by imposing restrictions on alienation of Indian property despite the "general rule . . . that the tenure, transfer, control and disposition of real property are matters which rest exclusively with the State where the property lies"). The present case falls between the poles

Congress "require" otherwise than that state law govern of its own force.

There will often be no specific federal legislation governing a particular transaction to which the United States is a party; here, for example, no provision of the Migratory Bird Conservation Act guides us to choose state or federal law in interpreting federal land acquisition agreements under the Act. But silence on that score in federal legislation is no reason for limiting the reach of federal law, as the Court of Appeals thought in *Leiter Minerals*. To the contrary, the inevitable incompleteness presented by all legislation means that interstitial federal lawmaking is a basic responsibility of the federal courts. "At the very least, effective Constitutionalism requires recognition of power in the federal courts to declare, as a matter of common law or 'judicial legislation,' rules which may be necessary to fill in interstitially or otherwise effectuate the statutory patterns enacted in the large by Congress. In other words, it must mean recognition of federal judicial competence to declare the governing law in an area comprising issues substantially related to an established program of government operation." Mishkin, 105 U. Pa. L. Rev., at 800.

This, then, is what has aptly been described as the "first" of the two holdings of *Clearfield Trust Co.* v. *United States, supra*—that the right of the United States to seek legal redress for duly authorized proprietary transactions "is a federal right, so that the courts of the United States may formulate a rule of decision." Friendly, In Praise of *Erie*—And of the New Federal Common Law, 39 N. Y. U. L. Rev. 383, 410 (1964). At

---

of *Burnison* and *Sunderland*. Here we deal with an unquestionably appropriate and specific exercise of congressional regulatory power which fails to specify whether or to what extent it contemplates displacement of state law.

least this first step of the *Clearfield* analysis is applicable here. We deal with the interpretation of a land acquisition agreement (a) explicitly authorized, though not precisely governed, by the Migratory Bird Conservation Act and (b) to which the United States itself is a party. Cf. *Bank of America* v. *Parnell,* 352 U. S. 29, 33 (1956). As in *Clearfield* and its progeny, "[t]he duties imposed upon the United States and the rights acquired by it . . . find their roots in the same federal sources. . . . In absence of an applicable Act of Congress it is for the federal courts to fashion the governing rule of law according to their own standards." 318 U. S., at 366–367; *United States* v. *Allegheny County,* 322 U. S. 174, 183 (1944); *United States* v. *Standard Oil Co.,* 332 U. S. 301, 305 (1947); *Board of County Comm'rs* v. *United States,* 308 U. S. 343, 349–350 (1939).[11]

### III

The next step in our analysis is to determine whether the 1937 and 1939 land acquisition agreements in issue should be interpreted according to "borrowed" state law—Act 315 of 1940. The availability of this choice was explicitly recognized in *Clearfield Trust* itself [12] and fully elaborated some years later in *United States* v. *Standard Oil Co., supra.* There we acknowledged that "in many situations, and apart from any supposed influence of the *Erie* decision, rights, interests and legal relations of the United States are determined by application of state law, where Congress has not acted specifically." 332 U. S., at

[11] *United States* v. *Certain Property,* 306 F. 2d 439 (CA2 1962), the principal decision relied on by the Court of Appeals in *Leiter Minerals, supra,* does not suggest application of state law, of its own force, to federal land acquisitions. See the discussion by the author of *Certain Property* in Friendly, 39 N. Y. U. L. Rev., at 411 n. 133.

[12] "In our choice of the applicable federal rule we have occasionally selected state law." 318 U. S., at 367.

308. We went on to observe that whether state law is to be applied is a question "of federal policy, affecting not merely the federal judicial establishment and the groundings of its action, but also the Government's legal interests and relations, a factor not controlling in the types of cases producing and governed by the *Erie* ruling. And the answer to be given necessarily is dependent upon a variety of considerations always relevant to the nature of the specific governmental interests and to the effects upon them of applying state law." *Id.,* at 309–310. See also *De Sylva* v. *Ballentine,* 351 U. S. 570, 580 (1956); *RFC* v. *Beaver County,* 328 U. S. 204 (1946); *Board of County Comm'rs* v. *United States,* 308 U. S., at 351–352; *Royal Indemnity Co.* v. *United States,* 313 U. S. 289, 296 (1941); *United States* v. *Yazell,* 382 U. S. 341, 356–357 (1966); cf. *United States* v. *Mitchell,* 403 U. S. 190 (1971).

The Government urges us to decide, virtually without qualification, that land acquisition agreements of the United States should be governed by federally created federal law. Cf. *United States* v. *93.970 Acres,* 360 U. S. 328 (1959). We find it unnecessary to resolve this case on such broad terms. For even if it be assumed that the established body of state property law should generally govern federal land acquisitions, we are persuaded that the particular rule of law before us today— Louisiana's Act 315 of 1940, as retroactively applied— may not. The "reasons which may make state law at times the appropriate federal rule are singularly inappropriate here." *Clearfield Trust,* 318 U. S., at 367.[13]

The Court in the past has been careful to state that, even assuming in general terms the appropriateness of

---

[13] In view of our disposition, we decline to resolve the continuing uncertainty, under Louisiana law, over the applicability of Act 315 to the mineral reservation in issue here. See *infra,* at 601–602.

"borrowing" state law, specific aberrant or hostile state rules do not provide appropriate standards for federal law. In *De Sylva* v. *Ballentine, supra,* we held that whether an illegitimate child was a "child" of the author entitled under the Copyright Act to renew the author's copyright was to be determined by whether, under state law, the child would be an heir of the author. But Mr. Justice Harlan's opinion for the Court took pains to caution that the Court's holding "does not mean that a State would be entitled to use the word 'children' in a way entirely strange to those familiar with its ordinary usage . . . ." 351 U. S., at 581. In *RFC* v. *Beaver County, supra,* the issue was whether the definition of "real property," owned by the RFC and authorized by Congress to be subject to state and local taxation, was to be derived from state law or to be fashioned as an independent body of federal law. The Court concluded that "the congressional purpose can best be accomplished by application of settled state rules as to what constitutes 'real property' "—but again the Court foresaw that its approach would be acceptable only "so long as it is plain, as it is here, that the state rules do not effect a discrimination against the Government, or patently run counter to the terms of the Act." 328 U. S., at 210. See also *U. A. W.* v. *Hoosier Cardinal Corp.,* 383 U. S. 696, 706 (1966).

Under Louisiana's Act 315, land acquisitions of the United States,[14] explicitly authorized by the Migratory

---

[14] In 1938, the Louisiana Legislature passed Act 68 and, later, Act 151. Both statutes barred prescription of mineral reservations in certain lands conveyed to the United States. Act 68 applied to land acquired by the United States or by the State of Louisiana "for use in the construction, operation or maintenance of any spillway or floodway" authorized by federal law. Act 151, broad enough in terms to supersede Act 68, provided that prescription would not run against mineral or royalty reservations or real estate "acquired

Bird Conservation Act, are made subject to a rule of retroactive imprescriptibility, a rule that is plainly hostile to the interests of the United States. As applied to a consummated land transaction under a contract which specifically defined conditions for prolonging the vendor's mineral reservation, retroactive application of Act 315 to the United States deprives it of bargained-for contractual interests.

To permit state abrogation of the explicit terms of a federal land acquisition would deal a serious blow to the congressional scheme contemplated by the Migratory Bird Conservation Act and indeed all other federal land acquisition programs. These programs are national in scope. They anticipate acute and active bargaining by officials of the United States charged with making the best possible use of limited federal conservation appropriations. Certainty and finality are indispensable in any land transaction, but they are especially critical when, as here, the federal officials carrying out the mandate of Congress irrevocably commit scarce funds.

The legislative history of the Migratory Bird Conservation Act confirms the importance of contractual certainty to the federal land acquisition program it authorizes. As originally enacted in 1929, the Act provided that land acquisitions might include reservations, ease-

---

by the United States of America, the State of Louisiana, or any of its subdivisions . . . for use in any public work and/or improvement." See generally Comment, Imprescriptible Mineral Reservations in Sales of Land to the State and Federal Governments, 22 Tul. L. Rev. 496 (1948).

Whether because the "floodway" and "public work" qualifications of the 1938 Acts make them inapplicable to the 1939 condemnation reservation in issue here, or because the parties' own agreement in 1939 reflects their belief that Act 151 was inapplicable, respondents do not argue that the 1938 legislation is material to the outcome of this case.

ments, and rights of way but that these were to be subject to "such rules and regulations" as the Secretary of Agriculture might prescribe "from time to time." § 6, 45 Stat. 1223. This sweeping statement of the Secretary's power to modify contract terms in favor of the Government had an unsettling effect on potential vendors; in 1935, the Act was amended to require the Secretary either to include his rules or regulations in the contract itself or to state in the contract that the reservation or easement would be subject to rules and regulations promulgated "from time to time." [15] A Congress solicitous of the interests of private vendors

---

[15] See S. Rep. No. 822, 74th Cong., 1st Sess., Report of the Special Committee on Conservation of Wildlife Resources on S. 3006, pp. 2–3 (1935):

"The Migratory Bird Conservation Act of 1929 established the Federal policy for the acquisition of areas for migratory waterfowl refuges. Under the provisions of that act, the Secretary of Agriculture was authorized when purchasing property for waterfowl refuges, to make certain reservations to be retained by the vendors of the property, but these reservations were subjected to regulations of the Secretary of Agriculture which might be made 'from time to time.' The administration of this act has developed some harassments in the acquisition of desirable waterfowl areas because some owners are not willing to convey their lands to the Federal Government on the indefinite and uncertain terms as provided in regulations made 'from time to time.'

"Obviously they may well be justified in their view, and, just as obviously, the Government may reasonably be secured in its interests by providing for enjoyment on the reservations under regulations to be stated in the conveyance at the time of its execution, leaving the vendor who has made the reservation to the general requirement of existing law that he will be subject to the rules and regulations of the Secretary of Agriculture governing the general administration of the area as a migratory bird refuge.

"Accordingly it is proposed to amend section 6 of the act of 1929 so that these reservations, in the discretion of the Secretary of Agriculture, may be subjected to regulations to be stated in the instrument of conveyance."

in the certainty of contract would hardly condone state modification of the contractual terms specified by the United States itself as vendee, whether or not those terms may be characterized as "rules and regulations" within the meaning of the Act.

Conceivably, our conclusion might be influenced if Louisiana's Act 315 of 1940, as applied retroactively, served legitimate and important state interests the fulfillment of which Congress might have contemplated through application of state law. But that is not the case. We do not deprecate Louisiana's concern with facilitating federal land acquisitions by removing uncertainty on the part of reluctant vendors over the duration of mineral reservations retained by them. From all appearances, this concern was a significant force behind the enactment of the 1940 legislation.[16] But today we are not asked to consider Act 315 on its face, or as applied to transactions consummated after 1940; we are concerned with the application of Act 315 to a pair of acquisition agreements in 1937 and 1939. And however legitimate the State's interest in facilitating federal land acquisitions, that interest has no application to transactions already completed at the time of the enactment of Act 315: the legislature cannot "facilitate" transactions already consummated.[17]

The Louisiana Supreme Court has candidly acknowledged two additional purposes which help to explain retroactive application of Act 315: to clarify the taxa-

---

[16] See the discussion in *Leiter Minerals, Inc.* v. *California Co.*, 241 La. 915, 932, 132 So. 2d 845, 851 (1961).

[17] Because we are concerned here with retroactive application of Act 315, there is likewise no basis for the Court of Appeals' suggestion that Act 315 simply places Louisiana citizens on the same footing as other States' citizens whose land is purchased or condemned by the United States.

bility by the State of mineral interests in the large federal land holdings in Louisiana, otherwise in doubt by virtue of the arcane and fluctuating doctrines of intergovernmental tax immunity; and to ensure that federal mineral interests could be subjected to state mineral conservation laws without federal pre-emption.[18]  We are not unsympathetic to Louisiana's concern for the consequences of a continuing, substantial, even if contingent, federal interest in Louisiana minerals.  Congress, however, could scarcely have viewed that concern as a proper justification for retroactive application of state legislation which effectively deprives the Government of its bargained-for contractual interests.  Our Federal Union is a complicated organism, but its legal processes cannot legitimately be simplified through the inviting expedient

[18] "There can be no doubt . . . that there were other objects and purposes for the enactment of Act 315 of 1940 . . . .

"One of the important sources of revenue of the State of Louisiana is the severance tax which is levied and collected by the state when natural resources such as oil and gas are produced and extracted from the land.  If the mineral rights were owned by the federal government in lands which the government had purchased, the mineral owner's share of the oil and gas produced from these lands would not be subject to taxation by the State of Louisiana, and the state would be deprived of large sums in taxes, especially since an immense area is owned by the federal government in oil-producing sections of this state, as the very facts of this case disclose.

"Moreover, the State of Louisiana in the exercise of its police power has authority to protect, conserve, and replenish the natural resources of the state and to prohibit and prevent their waste. . . . Under this power the Legislature has adopted laws regulating and controlling the production of oil and gas within the state.  By making mineral rights imprescriptible in lands sold to the government and retaining these rights in the vendors, Act 315 of 1940 avoided a possible conflict by the state in the exercise of its police power with the federal government."  241 La., at 933–934, 132 So. 2d, at 851–852.

of special legislation which has the effect of confiscating interests of the United States.[19]

Respondents point out that "[o]ne who owns land subject to an outstanding mineral reservation possesses no vested property interest [under Louisiana law], inasmuch as 'estates in reversion' are unknown to Louisiana law. Such an owner of the land possesses only a hope or expectancy to acquire these mineral rights; and . . . this hope or expectancy is not an object that can be legally sold." Brief for Respondents 27, citing, *e. g.*, *Hicks* v. *Clark*, 225 La. 133, 72 So. 2d 322 (1954). But whether Louisiana recognizes the interests at stake here as transferable interests in real property, as such, has

---

[19] In 1958, 18 years after the passage of Act 315, Louisiana enacted legislation that subjects the State and certain of its subdivisions to the rule of imprescriptibility. Louisiana Act 278 of 1958, La. Rev. Stat. § 9:5806 B (Supp. 1973). But this belated effort at statutory parity does not eliminate the adverse effect upon the United States, and upon the Migratory Bird Conservation Act, of retroactive application of Act 315 of 1940. For one thing, it is not clear whether the 1958 legislation will be given full retrospective effect by the Louisiana courts, reaching back to 1937 and earlier. More basic, even assuming retrospective application of the 1958 statute, the effect of the 1958 statute on Louisiana is not comparable to the effect of the 1940 Act on the United States. With or without legislation relating to prescription of mineral interests tied to governmental land acquisitions, Louisiana could plainly apply its own conservation laws and its own severance tax to any property in which the State held a contingent or even a present mineral interest. The 1958 legislation did nothing to reduce Louisiana's freedom in this respect. Act 315 of 1940, however, as applied retroactively, had the avowed purpose and would have the clear effect of permitting taxation and conservation regulation of minerals which, quite possibly, would otherwise fall within the Federal Government's exclusive domain. However parallel the two statutes in purpose and in their potential effect on actual mineral right ownership by the respective sovereigns, it is only Act 315 of 1940 that significantly affects interests of the United States in intergovernmental immunity.

no bearing on our conclusion that after-the-fact modification of explicit contractual terms would be adverse to the United States and contrary to the requirements of the Migratory Bird Conservation Act.

It is also of no import that, under Louisiana law as it might be articulated in 1973, the United States acquired from respondents only the reversion to a mineral interest of indefinite duration, a "hope" or "expectancy" revocable at any time by after-enacted legislation. Respondents place heavy reliance on the opinion of the Louisiana Supreme Court in *Leiter Minerals,* where that court held that a mineral reservation for an indefinite duration was one traditionally subject to retroactive prescriptive change. But even if this rule of law could have been anticipated in 1937 and 1939, when the United States agreed to the mineral reservations in issue here, that the 1937 and 1939 reservations were of "indefinite" duration could not have been. Indeed, some 20 years later, in 1957, when *Leiter Minerals* came to this Court for the first time, we were not in a position to resolve the Government's contention that the *Leiter* reservation was one of specific duration. Uncertainty over this question of Louisiana law was the guiding force behind our remand in hopes of obtaining the view of the Louisiana Supreme Court. In its advisory opinion, the Louisiana Supreme Court did not decide whether the *Leiter*-type reservation was "indefinite" and subject to retroactive modification—to the extent that the Federal District Court, in Louisiana, subsequently concluded that the servitude in the *Leiter* reservation was not, under state law, freely revocable. In *Leiter Minerals,* one Court of Appeals judge dissented on this state law issue, and, with reason, the Government renews the issue before the Court in this case.

Were the terms of the mineral reservations at issue here less detailed and specific, it might be said that the

Government acknowledged and intended to be bound by unforeseeable changes in state law. But the mineral reservations before us are flatly inconsistent with the respondents' suggestion that the United States in fact expected that these reservations would be wholly subject to retroactive modification. Nor, given the absence of any reliable contemporaneous Louisiana signpost and the absence even today of any final resolution of the pertinent state law question, can we say that the United States ought to have anticipated that its deed contained an empty promise. Respondents' reliance on the Louisiana Supreme Court's holding in its opinion in 1961 in *Leiter Minerals* assumes that a late-crystallizing doctrine of state law is appropriately applied to modify the expectations of the United States established by the terms of 1937 and 1939 bargains. The argument, however, is indistinguishable from respondents' defense of Act 315 itself. Years after the fact, state law may not redefine federal contract terminology "in a way entirely strange to those familiar with its ordinary usage . . . ." *De Sylva* v. *Ballentine,* 351 U. S., at 581.

## IV

In speaking of the choice of law to be applied, the alternatives are plain although in this case identifying them in fixed categories is somewhat elusive. One "choice" would be to apply the law urged on us by respondents, *i. e.,* Louisiana Act 315 of 1940. In some circumstances, such as those suggested by *RFC* v. *Beaver County,* 328 U. S. 204 (1946), or *Wallis* v. *Pan American Petroleum Corp.,* 384 U. S. 63 (1966),[20] state law may be found an acceptable choice, possibly even

[20] *Wallis* is readily distinguishable from the instant case; there the assignability of an oil and gas lease was in controversy between two private parties. That presented "no significant threat to any identifiable federal policy or interest." 384 U. S. 63, 68.

when the United States itself is a contracting party. However, in a setting in which the rights of the United States are at issue in a contract to which it is a party and "the issue's outcome bears some relationship to a federal program, no rule may be applied which would not be wholly in accord with that program." Mishkin, 105 U. Pa. L. Rev., at 805–806.

Since Act 315 is plainly not in accord with the federal program implemented by the 1937 and 1939 land acquisitions, state law is not a permissible choice here. The choice of law merges with the constitutional demands of controlling federal legislation; we turn away from state law by default. Once it is clear that Act 315 has no application here, we need not choose between "borrowing" some residual state rule of interpretation or formulating an independent federal "common law" rule; neither rule is the law of Louisiana yet either rule resolves this dispute in the Government's favor. The contract itself is unequivocal; the District Court concluded, and it is not disputed here, that by the clear and explicit terms of the contract reservations, "[respondents'] interests in the oil, gas, sulphur and other minerals terminated . . . no later than July 23, 1947, and August 30, 1949, unless Act 315 of 1940 has caused the reservations of the servitudes in favor of [respondents] to be imprescriptible."

We hold that, under settled principles governing the choice of law by federal courts, Louisiana's Act 315 of 1940 has no application to the mineral reservations agreed to by the United States and respondents in 1937 and 1939, and that, as a result, any contract interests of respondents expired on the dates identified by the District Court. Accordingly, we reverse the judgment of the Court of Appeals and remand the case for entry of an order consistent with this opinion.

*Reversed and remanded.*

MR. JUSTICE STEWART, concurring in the judgment.

I cannot agree with the Court that the mineral reservations agreed to by the United States and the respondents in 1937 and 1939 are governed by some brooding omnipresence labeled federal common law. It seems clear to me, as a matter of law, not a matter of "choice" or "borrowing," that when anyone, including the Federal Government, goes into a State and acquires real property, the nature and extent of the rights created are to be determined, in the absence of a specifically applicable federal statute, by the law of the State.

That was the very premise of the decision in *Leiter Minerals, Inc.* v. *United States,* 352 U. S. 220, 228–230 (1957), which remanded the case to the Court of Appeals with instructions to secure an authoritative construction of the *state* statute by the *state* courts, in order possibly to avoid deciding the federal constitutional issues. Other decisions of this Court lead to the same conclusion. *United States* v. *Yazell,* 382 U. S. 341, 352–358 (1966); *United States* v. *Burnison,* 339 U. S. 87, 89 (1950); *Davies Warehouse Co.* v. *Bowles,* 321 U. S. 144, 155 (1944); *Sunderland* v. *United States,* 266 U. S. 226, 232–233 (1924); *Mason* v. *United States,* 260 U. S. 545, 557–558 (1923); *United States* v. *Fox,* 94 U. S. 315, 320 (1877). Cf. *Wallis* v. *Pan American Petroleum Corp.,* 384 U. S. 63 (1966).

Since I think the Government's property acquisitions here are controlled by state law, the decisive question for me is whether the retroactive application of Louisiana Act 315 of 1940 to those acquisitions is constitutional.[1] The 1937 deed of purchase and the 1939 condemnation judg-

---

[1] Thus, I do not suggest, as the Court seems to think I do (*ante,* at 588 n. 7), that this controversy can necessarily be *finally* resolved through state law. Rather, my analysis is wholly consistent with the statement in *Leiter Minerals, Inc.* v. *United States,* 352 U. S. 220, 229–230 (1957), quoted by the Court today (*ante,* at 588 n. 7), that

ment were unequivocal: the mineral rights were reserved to the former owners of the land for a 10-year period, after which time—if certain conditions regarding exploration and production were not met—the reserved rights were to terminate, and complete fee title to the land, including the mineral rights, was to become vested in the United States. The Federal Government bargained for this contingent future interest in the minerals; it was clearly agreed to in the conveyances, and was thus reflected in the consideration paid by the Government to the former owners.

Yet the Court of Appeals held that Louisiana Act 315, which was enacted subsequent to those conveyances, operated to abrogate the agreed-upon terms of the mineral reservations by eliminating the Government's future interest. This retroactive application of Act 315, I believe, is a textbook example of a violation of Art. I, § 10, cl. 1, of the Constitution, which provides that no State shall pass any law "impairing the Obligation of Contracts." [2]

Accordingly, I concur in the judgment of the Court.

MR. JUSTICE REHNQUIST, concurring in the judgment.

I agree with my BROTHER STEWART that the central question presented by this case is whether Louisiana has the constitutional power to make Act 315 applicable to this transaction, and not whether a judicially created rule of decision, labeled federal common law, should

state courts "can decide definitively only questions of state law that are not subject to overriding federal law."

[2] This case is a far cry from *Home Building & Loan Assn.* v. *Blaisdell*, 290 U. S. 398 (1934), which upheld, in the face of a challenge based on the Contract Clause, emergency state legislation enacted to cope with the extraordinary economic depression existing in 1934. The retroactive application of Louisiana Act 315 serves no such paramount state interest. Cf. *City of El Paso* v. *Simmons*, 379 U. S. 497 (1965).

displace state law. The Migratory Bird Conservation Act does not establish a federal rule controlling the rights of the United States under the reservation. Whether Congress could enact such a provision is a question not now before us. In *Clearfield Trust Co.* v. *United States,* 318 U. S. 363, 366 (1943), this Court held that federal common law governed the rights and duties of the United States "on commercial paper which it issues . . . ." The interest in having those rights governed by a rule which is uniform across the Nation was the basis of that decision. But the interest of the Federal Government in having real property acquisitions that it makes in the States pursuant to a particular federal program governed by a similarly uniform rule is too tenuous to invoke the *Clearfield* principle, especially in light of the consistent statements by this Court that state law governs real property transactions.

What for my Brother STEWART, however, is a "textbook example" of a violation of the Obligation of Contracts Clause, is for me something more difficult. The scope of this clause has been restricted by past decisions of the Court such as *Home Building & Loan Assn.* v. *Blaisdell,* 290 U. S. 398 (1934), in which a Minnesota statute extending the period of time in which the mortgagor might redeem his equity following foreclosure was upheld in the face of vigorous arguments that the statute impaired a valid contract. Were there no simpler ground for disposing of the case, it would be necessary to resolve this very debatable question.

I believe that such another ground is present here, in view of the fact that Act 315 enacted by Louisiana by its terms applies only to transactions in which "the United States of America, or any of its subdivisions or agencies" is a party. While it is argued that Louisiana by other legislation made the same principle applicable

to the state government, this proposition is, as the Court's opinion points out, by no means demonstrated. And in any event the change in the period of prescriptibility was not made applicable to nongovernmental grantees.

Implicit in the holdings of a number of our cases dealing with state taxation and regulatory measures applied to the Federal Government is that such measures must be nondiscriminatory. See, *e. g., James* v. *Dravo Contracting Co.,* 302 U. S. 134 (1937); *New York* v. *United States,* 326 U. S. 572 (1946); *RFC* v. *Beaver County,* 328 U. S. 204, 210 (1946).

The doctrine of intergovernmental immunity enunciated in *McCulloch* v. *Maryland,* 4 Wheat. 316 (1819), however it may have evolved since that decision, requires at least that the United States be immune from discriminatory treatment by a State which in some manner interferes with the execution of federal laws. If the State of Pennsylvania could not impose a nondiscriminatory property tax on property owned by the United States, *United States* v. *Allegheny County,* 322 U. S. 174 (1944), *a fortiori,* the State of Louisiana may not enforce Act 315 against the property of the United States involved in this case. I therefore concur in the judgment of the Court.