**UNITED STATES of America, Plaintiff,**

v.

**ONE SINGLE FAMILY RESIDENCE WITH OUTBUILDINGS LOCATED AT 15621 S.W. 209TH AVENUE, MIAMI, FLORIDA, Defendant.**

No. 86–1208–Civ.

United States District Court,
S.D. Florida,
Miami Division.

June 30, 1988.

Leon B. Kellner, U.S. Atty., Guy W. Harrison, Asst. U.S. Atty., Miami, Fla., for plaintiff.

Joaquin Perez, Miami, Fla., for claimant.

## FINAL JUDGMENT OF FORFEITURE INCLUDING FINDINGS OF FACT AND CONCLUSIONS OF LAW

ARONOVITZ, District Judge.

This is an action brought by the United States for forfeiture of a certain parcel of realty which includes one single family residence, located at 15621 S.W. 209th Avenue, Miami, Florida. The Government seeks forfeiture pursuant to 21 U.S.C. Section 881(a)(7).

The case was tried non-jury by the Court on April 18, 19, and 20, 1988. The Court has considered all of the testimony and evidence presented at the trial, as well as the entire record in this matter, and being otherwise advised in the premises, hereby enters its findings of fact and conclusions of law.

## FINDINGS OF FACT

1. The legal description of the property sought to be forfeited is as follows:

Tract 293 of SOUTH DADE ACRES NO. 28, legally described as follows: The North 180 feet of the South 1408.98 feet of the West ½ of the East ½ of the Northeast ¼, subject to road and utility easement over the West 25 feet thereof, Section 28, Township 55, South Fange 38 East, Dade County, Florida, together with all improvements thereon, fixtures and appurtenances thereto.

2. The property is jointly owned by Carlomilton and Ibel Aguilera, husband and wife, as tenants by the entireties.

3. The sole claimant in this action is Ibel Aguilera. Carlomilton Aguilera has filed no claim for his interest in the property.

4. The land where the residence is built was purchased on July 27, 1981 by Carlomilton and Ibel Aguilera. The purchase price of the land was ten thousand dollars.

5. The residence was personally constructed by the Aguileras with the help of their family and friends. To date, the house is not completed and requires additional construction before a Certificate of Occupancy can be issued by the County.

6. Carlomilton and Ibel Aguilera, and their daughter Ailene Marie Aguilera, began to live at the residence on or about September 1, 1985.

7. In addition to the residence, an outbuilding has been constructed on the subject real property. The outbuilding is separate from the main residence, and is not used for human occupancy.

8. On or about February 18, 1986, DEA Special Agent Coleman Ramsey was contacted by Alabama State authorities. The Alabama authorities indicated that an individual cooperating with them, William T. Nichols, indicated that he could arrange purchases of substantial amounts of cocaine from Carlomilton Aguilera. Special Agent Ramsey arranged for Nichols to come to Miami, so that Nichols might orchestrate an undercover purchase of cocaine from Carlomilton Aguilera by DEA agents.

9. Nichols had a longstanding cocaine trafficking relationship with Carlomilton Aguilera. Nichols met Aguilera approximately three years earlier, and had travelled to Miami on a number of occasions to meet Aguilera for the purpose of purchasing cocaine. Approximately eighteen months before the transaction giving rise to this action, Nichols had become acquainted with Ibel Aguilera.

10. On February 20, 1988, Nichols went to the Aguilera residence wearing a concealed microphone and tape recorder, to negotiate the sale of approximately two kilograms of cocaine. The sale was to take place the following morning.

11. When Nichols arrived at the Aguilera residence, Ibel Aguilera greeted him perfunctorily. Ibel Aguilera testified that although she was familiar with Nichols, she did not care for him, and did make an effort to socialize or speak with him.

12. Nichols spoke with Carlomilton Aguilera in the kitchen of the residence as well as outside the residence. Ibel Aguilera remained in the living room during this time, and attended to her guests and her child. The television was played at a significant volume, and Ibel Aguilera was unaware of the substance of the conversation taking place between her husband and Nichols.

13. Ibel Aguilera eventually left the residence with her daughter to go to a Sears department store, and did not return until approximately 11:00 p.m., by which time Nichols had left and the negotiations had concluded.

14. At no time did Nichols witness Ibel Aguilera participate in narcotics transactions or use.

15. On February 21, 1985, DEA Special Agent Kenneth Peterson accompanied Nichols to the Aguilera residence. At that time, Carlomilton delivered approximately two kilograms of cocaine to Special Agent Peterson, for a price of $58,000. The cocaine was stored in the outbuilding on the property, and the transaction occurred at the Northeast corner of the house. During the transaction, Special Agent Peterson

asked Aguilera if he could obtain more cocaine, and Aguilera replied that he could obtain all Peterson wanted after the first transaction.

16. Carlomilton Aguilera was arrested on the subject property following the delivery of the cocaine, and consented to a search of the residence. The search revealed an Uzi semiautomatic pistol and a Remington rifle in the master bedroom closet, a Llama .380 pistol in the master bedroom dresser drawer, and a Spartorius digital scale in the vicinity of the master bedroom. The scale is a highly sensitive balance type scale, and is sensitive to one-tenth gram. Such scales are virtually standard accoutrements for narcotics dealers.

17. The cocaine which was siezed was stored in a bucket in the outbuilding, which is located approximately 300 feet away from the Aguilera residence. Agents of the DEA did not uncover cocaine or other contraband during their search of the residence.

18. On the morning of February 21, 1986, Ibel Aguilera was at work, and therefore was not present at the time Carlomilton Aguilera was arrested and charged with distribution of cocaine.

19. At the time of the arrest, William Nichols was acting in cooperation with law enforcement authorities of the State of Alabama. In exchange for this cooperation, the State and referral authorities agreed not to bring charges against Nichols for possession of a firearm by a convicted felon. Part of his cooperation included assisting Federal authorities in this case.

20. Nichols is an individual with a history of several felony charges; he has spent nearly twenty years of his life in jail. Three months after his cooperation in bringing about the arrest of Carlomilton Aguilera, Nichols was convicted of trafficking in cocaine in Alabama, and was serving a jail sentence at the time his sworn testimony was given in this case.

21. The Court attaches minimal credibility to the statements made by Nichols, and disbelieves his testimony that Ibel Aguilera was present on two prior occasions when illegal activity was discussed or conducted.

22. None of the evidence introduced at trial, and nothing in the record of this case, suggests that Ibel Aguilera had knowledge or suspicion that her husband was involved in drug trafficking, or that the subject real property was used to facilitate narcotics transactions. The Court makes this finding on the basis of the credibility of the witnesses, their demeanor on the stand, and their interest in the action. Aguilera testified credibly to her lack of knowledge of her husband's narcotics activities, and the testimony of her neighbors and her employer tend to corroborate this testimony.

## CONCLUSIONS OF LAW

*Conclusions Regarding Innocent Ownership*

A. 21 U.S.C. Section 881(a)(7) requires the forfeiture of any real property and improvements thereon when there is probable cause to believe that the property was used to facilitate a violation of 21 U.S.C. Section 802, *et seq.*, punishable by more than one year's imprisonment.

B. "Probable cause" for forfeiture is defined as "reasonable ground for belief of guilt, supported by less than prima facie proof, but more than reasonable suspicion." *United States v. A Single Family Residence*, 803 F.2d 625, 628 (11th Cir.1986).

C. The evidence at trial established probable cause that the subject real property was used to facilitate a prohibited narcotics transaction. Aguilera's arrest, indictment, and conviction establish conclusively that the property was used to facilitate the possession and sale of cocaine.

D. Once probable cause is established, the burden of proof shifts to the claimant to demonstrate by a preponderance of the evidence that she is an innocent owner who did not know of the property's connection to drug trafficking, and that she took every reasonable precaution to prevent the property's use in drug trafficking. *Single Family Residence*, 803 F.2d at 629; *United States v. One (1) 28' International Vessel*, 741 F.2d 1319, 1322 (11th Cir.1984).

■ E. Ibel Aguilera was entitled to assume, in the absence of facts which would raise the suspicion of a reasonable person, that her husband was not involved in narcotics trafficking. No credible evidence exists in the record which would raise such a suspicion.

■ F. The tape recording of William Nichols' meeting with Carlomilton Aguilera did not demonstrate that Ibel Aguilera was within hearing range of their conversation at any time during which the sale or purchase of cocaine was discussed. The testimony of Joel Charles, an expert in reconstruction of events monitered by audiotape, did not establish the proximity of Ibel Aguilera during the narcotics discussions.

G. Conflicting testimony was introduced as to whether the Spartorius scale was present in the Aguilera home on occasions other than the morning of Carlomilton Aguilera's arrest. In addition, testimony was introduced concerning the possible use of the scale to weigh feed for fighting cocks which the Aguileras raised on their property. The testimony established that feed for fighting cocks must be carefully controlled to produce an animal suitable for fighting.

On the basis of the credibility of various witnesses, and in recognition of the frequent possession of sensitive scales by narcotics traffickers, the Court finds that the scale was used at least in part to conduct narcotics transactions. The Court further finds, however, that Ibel Aguilera did not observe the scale in the vicinity of the master bedroom, and that she was unaware of its use for weighing narcotics.

H. In the area in which the Aguilera property is located, it is common for homeowners to keep firearms. Ibel Aguilera was aware that her husband kept firearms in the residence, but was unaware that certain of those firearms might be characterized as assault weapons rather than defensive weapons.

I. Carlomilton kept irregular hours, and did not inform his wife of his comings and goings. The nature of Ibel Aguilera's relationship with her husband was such that she did not question him concerning activities in which she was not included.

J. During the period prior to his arrest, Carlomilton Aguilera had an extensive extramarital affair of which Ibel Aguilera had no knowledge or suspicion. A husband does not ordinarily reveal such an affair to his wife, and the Court therefore does not regard this fact as having great weight in establishing the extent of Ibel Aguilera's knowledge of her husbands activities. Nevertheless, the extent to which Carlomilton Aguilera was able to conceal this relationship, and the apparent ease with which it was concealed, suggests that his marriage was characterized by privacy and secrecy rather than intimacy and knowledge.

K. Ms. Aguilera has been gainfully employed during the past five years at Amnet Financial Corporation in Homestead, Florida, where she is currently a Vice President and credit examiner. During her marriage to Carlomilton Aguilera, she has not enjoyed a lavish lifestyle or the benefit of unexplained income. The residence on the subject real property was constructed by the efforts of the Aguileras themselves, subject to financial constraints.

L. Ibel Aguilera has shown by a preponderance of the evidence that she was unaware that the property was being used to facilitate narcotics transactions, and that if facts giving rise to a reasonable suspicion of such activity had come to her attention, she would have taken appropriate steps to prevent the proscribed use of the property. Under the facts of the case, her claim of innocent ownership is legally sufficient, and she is entitled to a return of her interest in the subject property.

*Conclusions Regarding Ownership Interest*

M. Title to the subject property is held by Carlomilton and Ibel Aguilera as tenants by the entireties.

■ N. The federal forfeiture statute governing this action, 21 U.S.C. Section 881, provides that

All right, title, and interest in property described in subsection (a) of this section shall vest in the United States upon com-

mission of the act giving rise to forfeiture under this section.

21 U.S.C. Section 881(h). This provision codifies the "relation back" doctrine of federal common law, under which the right to the forfeit property vests in the United States immediately upon the commission of the prohibited act. *United States v. $41,305 in U.S. Currency*, 802 F.2d 1339, 1346 (11th Cir.1986); *United States v. Stowell*, 133 U.S. 1, 16–17, 10 S.Ct. 244, 247–48, 33 L.Ed. 555 (1890).

O. The scope of the real property right forfeited due to use of the property to facilitate narcotics transactions is limited by 21 U.S.C. Section 881(a)(7), which provides, in relevant part, that

> no property shall be forfeit under this paragraph, to the extent of an interest of an owner, by reason of any act or omission established by that owner to have been committed or omitted without the knowledge or consent of that owner.

It is clear from the language of the statute that although forfeiture relates back to the time of commission of the illegal act, the interest of an innocent owner is not forfeit at any time.

P. The Government has argued that because Federal forfeiture is an action *in rem* against the subject property rather than *in personam* against the owners, title is transferred upon commission of the prohibited act, and a tenancy by the entirety is therefore destroyed by removal of title from the marital unit. *See, e.g., Pace v. Woods*, 177 So.2d 779 (Fla.Dist.Ct.App. 1965). There is no basis for such an automatic result in the language of the forfeiture statute. An innocent owner's interest may be so broad as to encompass the entire property, so that nothing is available for forfeiture at the time of the illegal act.

Thus, to determine whether a tenancy by the entirety is destroyed at the time of an illegal act by one spouse alone, it must first be determined whether the innocent spouse's interest is broad enough to preclude the transfer of an interest in the subject property. A preliminary question, however, is whether the interest of the innocent spouse must be determined under state law or, since there is no governing federal statute, whether a rule of federal common law must be fashioned.

▮▮▮ Q. In answering this question, the Court must consider whether the application of state rules governing tenancies by the entirety would effect a discrimination against the government, or violate the express terms of an Act of Congress. *RFC v. Beaver County*, 328 U.S. 204, 66 S.Ct. 992, 995, 90 L.Ed. 1172 (1946); *United States v. Little Lake Misere Land Co.*, 412 U.S. 580, 93 S.Ct. 2389, 2399, 37 L.Ed. 2d 187 (1973). State property rules which run counter to the provisions of a federal land acquisition program, or which damage the efficacy of a federal regulatory program, must yield to overriding federal concerns. *See, e.g., North Dakota v. United States*, 460 U.S. 300, 103 S.Ct. 1095, 75 L.Ed.2d 77 (1983); *Little Lake Misere Land Co., supra.*

None of these concerns is implicated significantly by the application of state property rules to the federal forfeiture statute. The statute cannot be characterized as a land acquisition program: its goal is not the acquisition of land, but rather is the punishment of narcotics offenders and the inhibition of their operations. *See infra.* Nor is the statute regulatory in nature, except in the broad sense that all criminal and quasi-criminal laws serve to regulate behavior which is undesirable from a societal viewpoint. The application of state laws governing tenancies by the entirety may limit the scope of the property actually forfeited to the federal government, but this fact alone does not constitute hostility to or discrimination against a federal statutory program.

R. State laws governing tenancies by the entirety have been applied by federal courts in determining the property interests available for the satisfaction of a federal tax lien. Title 26 U.S.C. Section 6321 creates a lien in favor of the United States upon "all property and rights to property, whether real or personal," belonging to a person who has refused to pay any tax for which he is liable. Thus, the threshold question in such a case is "whether and to

what extent the taxpayer had 'property' or 'rights to property' to which a tax lien may attach." *Tony Thornton Auction Service v. United States,* 791 F.2d 635, 637 (8th Cir.1986), citing *Aquilino v. United States,* 363 U.S. 509, 512, 80 S.Ct. 1277, 1279, 4 L.Ed.2d 1365 (1960). Borrowing of state property rules is appropriate because Section 6321 "creates no property rights but merely attaches consequences, federally defined, to rights created under state law." *Tony Thornton Auction Service,* 791 F.2d at 637; *Aquilino,* 363 U.S. at 513, 80 S.Ct. at 1280.

Tenancies by the entirety, and the protections afforded those tenancies under state law, have been given full effect in the tax lien cases. *See, e.g., United States v. Gurley,* 415 F.2d 144 (5th Cir.1969); *United States v. American National Bank of Jacksonville,* 255 F.2d 504 (5th Cir.1958); *United States v. Hutcherson,* 188 F.2d 326 (8th Cir.1951). The reduction of property available to satisfy delinquent tax claims has been rejected as a basis for departing from a rule of law "not repugnant to any law of the United States, and upon which many valuable property rights are based." *Hutcherson,* 188 F.2d at 330.

S. Unlike the federal tax lien statute, which gives rise to an *in personam* action, 21 U.S.C. Section 881 gives rise to an *in rem* action for forfeiture. Like the tax lien statute, however, the effect of the forfeiture statute turns on the construction of property rights which the statute itself does not define. Furthermore, the term "interest in property," as used in the forfeiture statute, is the linguistic equivalent of "rights to property" as used in the tax lien statute.[1]

T. Because, in the absence of explicitly statutory rules to the contrary, federal courts have given full effect to property interests as they are created under state law, and because recognition of tenancies by the entirety is not repugnant to the federal forfeiture scheme, the Court concludes that application of state law is the most appropriate method of determining the interest of an innocent owner under 21 U.S.C. Section 881(a)(7).

U. Under Florida law, an estate held by the entireties cannot be forfeited by the criminal conduct of one spouse acting alone. *Smith v. Hindery,* 454 So.2d 663, 664 (Fla.Dist.Ct.App.1984); *Parrish v. Swearington,* 379 So.2d 185 (Fla.Dist.Ct. App.1980). An estate by the entireties is vested in the husband and wife as one person, *Murray v. Sullivan,* 376 So.2d 886, 889 (Fla.Dist.Ct.App.1979), and may therefore become forfeit due to the criminal conduct of one spouse only upon a showing that the other spouse knowingly acquiesced in the criminal behavior. *Smith,* 454 So.2d at 669 (Zehmer, J., concurring specially).

V. Ibel Aguilera is an innocent owner and a tenant by the entirety under Florida law. As such, she is entitled to retain the subject property in its entirety, and may not be deprived of any part of the property because of her husband's criminal activity in which she did not participate, and of which she did not know. The defendant property is not subject to forfeiture.[2]

1. "Interest" is defined as "right, title, or legal share in something." Webster's New Collegiate Dictionary (1979).

2. The Government has also argued that both spouses are indispensable parties in an action involving a claim against title to entireties property. Under Florida law, a creditor must join both tenants before entireties property may be made available to answer for the judgment debts of one of the tenants individually. *Ellis Sarasota Bank & Trust Co. v. Nevins,* 409 So.2d 178, 180 (Fla.Dist.Ct.App.1982); *Meyer v. Faust,* 83 So.2d 847 (Fla.1955). It is apparent that such a claim, which may be based only upon allegations of fraudulent transfer, should be adjudicated with all interested parties before the Court.

The Court observes, however, that the Florida cases involve lawsuits brought against the debtor spouse alone. In that situation, joinder is essential to ensure that the facially innocent party is present to defend her rights to the entireties property. It does not follow that an errant spouse is an indispensable party to all actions in which an innocent spouse seeks protection against forfeiture.

If the Government felt that Carlomilton Aguilera was an indispensable party to this action, it could have sought to join him as an involuntary party pursuant to Fed.R.Civ.P. 19(a). Having failed to do so, the Government cannot be heard to complain of his absence at this late date.

**1538**

W. This result reached does nothing to undermine federal forfeiture policy. Although the 21 U.S.C. Section 881 speaks to the subject property *in rem*, it is clear that "viewed in its entirety, the forfeiture statute is intended to impose a penalty only upon those who are significantly involved in a criminal enterprise. *Faldraga v. Carnes*, 674 F.Supp. 845, 846 (S.D.Fla. 1987); *C.f. United States v. United States Coin Currency*, 401 U.S. 715, 91 S.Ct. 1041, 1045, 28 L.Ed.2d 434 (1971). More particularly, the statute at issue has as its central purpose the crippling of illegal trafficking and narcotics activity. *C.f. United States v. One 1972 Datsun*, 378 F.Supp. 1200, 1205 (D.N.H.1974). At the same time, Congress has explicitly provided for the protection of innocent owners of real property from unwarranted forfeitures. The unflinching protection of the entire interest of such an owner is consistent with federal forfeiture policy.

■ X. The stringent burden imposed on innocent owners to demonstrate their lack of knowledge of criminal acts committed on their property serves to alleviate concern that recognition of state-created tenancies by the entirety will work as an inequitable shield for those who traffic in narcotics. The Government is not required to produce direct evidence of the knowledge of a spouse in order to prove knowing acquiescence in criminal activity. In many instances, the nature and circumstances of the marital relationship, or the unaccountable luxuries enjoyed by couples receiving narcotics-related income, may well give rise to an inference of knowledge of the spouse claiming innocent ownership. It will no doubt be the exception, rather than the rule, that a testifying spouse subjected to rigorous cross-examination will convince the Court, through credibility as well as corroborating evidence, that the activities of the other spouse were unknown. Where this exceptional situation obtains, there is no legal justification for deprivation of the innocent spouse's property interest.

Y. In addition, it may well be that other circumstances may arise in a case of this nature which would compel a Court to ignore the protection afforded by state law governing tenancies by the entirety. For example, evidence that the culpable spouse created entireties interests in property after forming an intent to traffic in narcotics could bring such a tenancy within the scope of a fraudulent conveyance. *C.f. United States v. One 1967 Ford Thunderbird*, 316 F.Supp. 391 (D.Md.1970); *Payne v. United States*, 247 F.2d 481 (8th Cir.1957).[3] There is no such evidence before the Court today, and so this and other questions are necessarily left for resolution in future decisions.

It is therefore ORDERED AND ADJUDGED that the Government's suit for forfeiture is hereby DENIED, the defendant property shall be returned to Ibel Aguilera forthwith, and this action is hereby DISMISSED with prejudice.

DONE AND ORDERED.

---

**3.** The cited cases turn on application of borrowed state laws of fraudulent conveyance. Although the Court has adopted state law as the proper determinant of innocent owner interests, it is possible that federal common law might be called upon in the future to evaluate claims of fraud.