United States Court of Appeals
Fifth Circuit

**F I L E D**

June 20, 2006

Charles R. Fulbruge III
Clerk

In the

United States Court of Appeals

for the Fifth Circuit

_____

№ 05-30219

_____

WATERFOWL LIMITED LIABILITY COMPANY AND LACASSANE COMPANY, INC.,

Plaintiffs-Appellees,

JARDIN MINERALS COMPANY AND BRUIERE MINERALS COMPANY,

Intervenor Plaintiffs-Appellees,

VERSUS

UNITED STATES OF AMERICA,

Defendant-
Intervenor Defendant-
Appellant.

_____

Appeal from the United States District Court
for the Western District of Louisiana

_____

Before JOLLY, SMITH, and GARZA,
   Circuit Judges.

JERRY E. SMITH, Circuit Judge:

   The United States appeals a judgment that

its mineral royalty, attached to mineral servitudes on the relevant land, had (except for a forty-one acre tract) prescribed in accordance with Louisiana law because of the lack of qualifying production for a period in excess of ten years. We reverse and remand.

I.

A.

In 1937, acting under the authority of the Migratory Bird Conservation Act, 16 U.S.C. § 715 *et seq.*, the United States purchased approximately 13,000 acres of land in Cameron Parish, Louisiana, from plaintiff Lacassane Co., Inc. ("Lacassane"), to be included in the Lacassine National Wildlife Refuge. A portion of the acreage was subject to a pre-existing mineral servitude (the "Gardiner Servitude") held by a previous owner of that tract.[1] The Gardiner Servitude was a one-half interest in the minerals contained in the relevant parcel.

In its deed of sale, Lacassane reserved for itself all mineral rights in the entire acreage (the "Lacassane Servitude"). Because the Gardiner Servitude was created first, the Lacassane Servitude was subject to the Gardiner Servitude. As a result, after selling the land to the government, Lacassane held all mineral rights in the land not subject to the Gardiner Servitude and a one-half mineral interest in the land subject to the Gardiner Servitude.

B.

At the time the United States acquired the land, all mineral servitudes in Louisiana were subject to the rule of "liberative prescription." A servitude would prescribe if it went unused for ten years, and parties could not contract to extend the ten-year prescription period.[2] In 1940, however, Louisiana passed Act 315, which provided as follows:

> When land is acquired by conventional deed or contract, condemnation or expropriation proceedings by the United States of America, or any of its subdivisions or agencies from any person, firm or corporation, and by the act of acquisition, order or judgment, oil, gas or other minerals or royalties are reserved, or the land so acquired is by the act of acquisition conveyed subject to a prior sale or reservation of oil, gas, or other minerals or royalties, still in force and effect, the rights so reserved or previously sold shall be imprescriptible.

*United States v. Little Lake Misere Land Co., Inc.*, 412 U.S. 580, 584 (1973) (quoting the statute); *see also* LA. REV. STAT. § 31:149 (current successor to Act 315). Act 315 was meant to "facilitat[e] federal land acquisitions by removing uncertainty on the part of reluctant vendors over the duration of mineral reservations retained by them." *Little Lake Misere*, 412 U.S. at 599.

Despite the apparently forward-looking purpose of the Act, the Louisiana Supreme Court held that it applied even to federal acquisitions, such as the government's purchase of land from Lacassane, that had taken place before the Act was passed. *See Whitney Nat'l Bank v. Little Creek Oil Co.*, 33 So. 2d 693,

---

[1] Louisiana does not recognize separate mineral estates. Mineral rights "can only be held separate from the surface land in the form of a mineral servitude." *Cent. Pines Land Co. v. United States*, 274 F.3d 881, 884 (5th Cir. 2001) (citing *Frost-Johnson Lumber Co. v. Salling's Heirs*, 91 So. 207, 245 (La. 1920)). A mineral servitude is "the right of enjoyment of land belonging to another for the purpose of exploring for and producing minerals and reducing them to possession and ownership." LA. REV. STAT. § 31:21.

[2] *See Hightower v. Martizky*, 195 So. 518, 520-21 (La. 1940). Lacassane's reservation of mineral rights in the 1937 acquisition contract contained an express term of prescription similar to that existing under Louisiana law. The current Louisiana rules for prescription of a servitude are codified at LA. REV. STAT. §§ 31:27-61.

2

696 (La. 1947). In addition, the court held that Act 315 superseded not only the prior default statutory rule of prescription but also pre-existing contractual terms of prescription. *See Leiter Minerals, Inc. v. Cal. Co.*, 132 So. 2d 845, 854-55 (La. 1961). Under the regime set up by the Louisiana Supreme Court, servitudes on land owned by the United States, which were prescriptible by statute or by contract when created, became imprescriptible under Act 315.

In *Little Lake Misere*, 412 U.S. at 592, the United States Supreme Court reversed, in part, these decisions of the Louisiana Supreme Court, holding that when a land acquisition by the United States arises from and bears heavily on a federal regulatory program, state law cannot, of its own force, govern the acquisition. Instead, federal law must provide the rule of decision. Although state law often should be "borrowed" as the federal rule of decision, "specific aberrant or hostile state rules do not provide appropriate standards for federal law." *Id*. at 596. The Court held that Act 315 could not be borrowed as the law governing certain pre-1940 federal land acquisitions pursuant to the Migratory Bird Conservation Act, because

> [a]s applied to a consummated land transaction under a contract which specifically defined conditions for prolonging the vendor's mineral reservation, retroactive application of Act 315 to the United States deprives it of bargained-for contractual interests. . . . To permit state abrogation of the explicit terms of a federal land acquisition would deal a serious blow to the congressional scheme contemplated by the Migratory Bird Conservation Act and indeed all other federal land acquisition programs.

*Id*. at 597.

Having determined that Act 315 could not govern the federal land acquisitions at issue, the Court did not need to choose between adopting "residual" Louisiana law (Louisiana law excepting Act 315) and "formulating an independent federal 'common law' rule" of prescription. The explicit prescription terms of the acquisition contract controlled, rendering the servitudes at issue prescriptible and already prescribed. *Id*. at 604.

C.

The instant plaintiffs, intervenors, and their ancestors in title, holders of the Lacassane and Gardiner Servitudes, were in a position similar to that of the *Little Lake Misere* plaintiffs. The United States had acquired the land subject to said servitudes before passage of Act 315, and the acquisition contract contained an express term of prescription for the Lacassane Servitude.[3] The holders of the Gardiner and Lacassane Servitudes sued in federal court in 1984, seeking a declaratory judgment that their servitudes, although prescriptible pursuant to *Little Lake Misere*, had not yet prescribed.[4]

---

[3] As we have noted, the Gardiner Servitude had been created before the government's acquisition of the relevant land. The government therefore could not bargain for an explicit term of prescription for that servitude. We held in *Central Pines*, 274 F.3d at 891-92, however, that a federal interest "in obtaining . . . mineral rights via the default rule of prescription in place before Act 315" is strong enough to prevent the borrowing of Act 315 as the rule of decision for pre-1940 federal land acquisitions, even where there is no explicit contractual term of prescription for the relevant servitude. The relevance of *Central Pines* is discussed more thoroughly *infra*.

[4] The underlying litigation is *Brewer v. United*
(continued...)

In 1988, the parties entered into a settlement agreement with the United States, which confirmed that the Gardiner and Lacassane Servitudes remained validly in existence. In exchange, the servitude owners agreed to carve a mineral royalty and bonus and rental rights out of the servitudes and to convey them to the United States.

Pursuant to the settlement, the servitude owners executed an act of conveyance, which granted the United States one-half of all royalties received by the servitude owners on oil, gas, or other minerals attributable to the land subject to the Lacassane and Gardiner Servitudes, with certain articulated exceptions. The servitude owners also conveyed to the government "one-half of all rentals and bonuses received by [the servitude owners] under the terms of any oil, gas and mineral lease of the [subject land] . . . from and after such time as one-half of the income from such bonuses and rentals shall equal the sum of $750,000.00."[5]

Under Louisiana law, a mineral royalty is "the right to participate in production of min-

---

[4](...continued)
*States*, No. 84-0270 (W.D. La.) (the "*Brewer* litigation").

[5] The conveyance to the United States of bonus and rental rights under mineral leases is not central to this action. A mineral lease is "a contract by which the lessee is granted the right to explore for and produce minerals." LA. REV. STAT. § 31:114. A bonus is "money or other property given for the execution of a mineral lease, except interests in production from or attributable to property on which the lease is given." *Id.*. § 31:213(1). A rental is "money or other property given to maintain a mineral lease in the absence of drilling or mining operations or production of minerals." *Id.* § 31:213(4).

erals from land owned by another or land subject to a mineral servitude owned by another. Unless expressly qualified by the parties, a royalty is a right to share in gross production free of mining or drilling and production costs." LA. REV. STAT. § 31:80. When a royalty right is "created by one whose title terminates at a particular time or upon the occurrence of a certain condition," such as an owner of a servitude, the royalty extinguishes when the underlying title extinguishes. *Id.* § 31:83.

In addition, royalty rights, like servitudes, are real property rights owned separately from "perfect title" in the land and are subject to prescription after ten years of nonuse. *See id.* § 31:85. There are different rules for servitudes and royalty rights, however, with regard to what counts as a qualifying use capable of interrupting the prescription period.

Most notably, good faith drilling operations, even if unsuccessful, interrupt prescription running against a servitude. *See id.* § 31:27 *et seq.* On the other hand, only actual production of minerals subject to the royalty interest interrupts prescription running against a royalty. *See id.* § 31:85 *et seq.* Thus, while a mineral royalty carved out of a servitude is always extinguished when the servitude ceases to exist, it also can be extinguished before the servitude expires. The royalty, in other words, is prescriptible separately from the servitude.

In 2003, Waterfowl Limited Liability Company ("Waterfowl"), holder of a two-thirds interest in the Gardiner Servitude, and Lacassane, holder of the Lacassane Servitude, sued for a declaratory judgment that the government's mineral royalty on production from the Gardiner and Lacassane servitudes had (with the exception of a forty-one acre tract subject to the Garrison No. 1 well) prescribed in accordance with Louisiana law as a result of

4

the lack of qualifying production for a period in excess of ten years. In an amended complaint, Waterfowl and Lacassane included a claim under the Quiet Title Act, 28 U.S.C. § 2409, seeking a determination that the mineral rights conveyed by the servitude owners to the United States had been extinguished by application of the Louisiana Mineral Code.

The district court allowed Jardin Minerals Company ("Jardin") and Bruiere Minerals Company ("Bruiere") to intervene because they own mineral rights affected by the government's royalty. Jardin holds a one-third interest in the Gardiner Servitude, and Bruiere holds the mineral royalty and executive rights attributable to Jardin's interest.[6]

The government stipulates that its royalty has prescribed under Louisiana law, but it contends that Louisiana law does not govern the rights established in the settlement agreement and the implementing act of conveyance. Rather, the government argues that pursuant to *Little Lake Misere* and *Central Pines*, federal law controls the rights at issue. Furthermore, the government contends that the relevant rules of the Louisiana Mineral Code cannot be borrowed as the federal rule of decision because the state rules are hostile to the government's interests. The government asserts that the terms of the settlement agreement and act of conveyance establish that the royalty is not separately prescriptible and can cease to exist only when the underlying servitudes are extinguished.

The parties forewent a trial and agreed that the district court should enter final judgment on the basis of the stipulations, submitted documentary evidence, and briefs. Applying Louisiana law of its own force, and in the alternative borrowing state law as the federal rule of decision, the court entered judgment in favor of the servitude owners as to all claims. The United States appeals.

II.

We review questions of law, including choice of law and contract interpretation, *de novo*.[7] Because this matter involves determining whether federal or state law applies, and also involves interpreting a settlement agreement, we utilize that standard here.

III.

*Little Lake Misere* sets up a two-tiered inquiry for determining what law governs the rights at issue in cases such as this. First, we must determine whether federal law controls or state law applies of its own force. Second, if we decide that federal law controls, we must determine the content of the applicable federal law. Specifically, we must decide whether to adopt state law as the federal rule of decision. Because the government has conceded that its royalty has prescribed under Louisiana law, it can succeed only if federal law applies and state law is not borrowed as the federal rule of decision.

---

[6] For the sake of simplicity, the remainder of this opinion will refer to Waterfowl, Lacassane, Jardin, and Bruiere collectively as the "servitude owners," even though Bruiere does not hold a servitude interest.

[7] *See Adams v. Unione Mediterranea di Sicurta*, 220 F.3d 659, 674 (5th Cir. 2000); *Dell Computer Corp. v. Rodriguez*, 390 F.3d 377, 384 (5th Cir. 2004); *see also Guidry v. Halliburton Geophysical Serv., Inc.*, 976 F.2d 938, 940 (5th Cir. 1992) (stating that "[a] settlement agreement is a contract").

### A.

In answering the initial choice of law question, the Court in *Little Lake Misere*, 412 U.S. at 592, placed particular emphasis on whether the transaction at issue "is one arising from and bearing heavily upon a federal regulatory program." If this condition is met, state law cannot apply to the transaction of its own force. In determining that federal law controlled the particular acquisition before it, the Court reasoned as follows:

> We deal with the interpretation of a land acquisition agreement (a) explicitly authorized, though not precisely governed, by the Migratory Bird Conservation Act and (b) to which the United States itself is a party. As in *Clearfield* and its progeny, "the duties imposed upon the United States and the rights acquired by it find their roots in the same federal sources . . . . In absence of an applicable Act of Congress it is for the federal courts to fashion the governing rule of law according to their own standards."

*Id.* at 594 (quoting *Clearfield Trust Co. v. United States*, 318 U.S. 363, 366-67 (1943)).

In *Central Pines*, we dealt with a federal land acquisition similar to the one in *Little Lake Misere*, with one notable distinction. In *Little Lake Misere*, the acquisition contract contained an express term of prescription for the relevant servitude created at the time of the acquisition. The servitude at issue in *Central Pines*, however, was already in existence when the United States purchased the relevant land; thus, there was no express term of prescription in the acquisition contract, because the government was incapable of bargaining for such a term. We held that the absence of an explicit contractual right was not enough to render state law applicable of its own force where the remaining operative conditions of *Little Lake Misere*—a purchase pursuant to a federal statute with the United States as a party to the acquisition—were present. We stated that

> [w]hether or not the United States bargained over the creation of the servitude, the acquisition subject to the existing servitude created a federal interest in the potential prescription of the mineral servitude conveyed by the 1929 deed via the rule of prescription in place at the time of contract. . . . The term at issue in *Little Lake* in effect set the prescriptive period for the reserved mineral servitude. The Government's contract "right" was to obtain the mineral rights after the *contractual* prescriptive period had elapsed. Similarly, in this case the Government's right is to obtain the mineral rights after the *default* prescriptive period has elapsed. This right, as in *Little Lake*, is federal—though arguably weaker because it arises from a default rule.

274 F.3d at 888-89.

Based on *Little Lake Misere* and *Central Pines*, federal law undoubtedly controlled the rights at issue in the *Brewer* litigation out of which the government's mineral royalty arose. By purchasing the land subject to the Gardiner and Laccassane Servitudes pursuant to the Migratory Bird Conservation Act and before the passage of Act 315, the United States acquired interests in the reversion of the mineral rights on the extinction of those servitudes following the end of the contractual period of prescription with respect to the Lacassane Servitude and the end of the then-existing statutory prescription period with respect to the Gardiner Servitude. Those reversionary interests, per *Little Lake Misere* and *Central Pines*, are governed by federal law.

The question, however, is whether the royalty right conveyed to the United States as part of the settlement of the *Brewer* litigation must also be governed by federal law. The servitude owners argue, and the district court agreed, that because the royalty was obtained as consideration in a settlement agreement rather than as part of a land acquisition pursuant to a federal program, federal law does not control. The government contends, to the contrary, that rights obtained in the settlement of a dispute over federal interests are equally matters of federal law. The government argues that by modifying the rights established between the parties as part of the 1937 acquisition, the *Brewer* settlement did not displace the Migratory Bird Conservation Act as the legal foundation for those rights.

We agree with the government. The United States was able to obtain the instant royalty interest only because it had the authority under the Migratory Bird Conservation Act to purchase the land to which the royalty was attached and to acquire, as part of that purchase, reversionary interests in the mineral rights on that land. The fact that the United States obtained the royalty as part of a reorganization of the rights the parties held under the initial deed should not render federal law inoperative. In the language of *Clearfield Trust*, the government's royalty right finds its root in the same federal source that allowed the 1937 acquisition. Accordingly, federal law controls the right, including its prescriptibility.

### B.

Having determined that federal law controls the royalty right in issue, we must decide whether to adopt Louisiana law as the federal rule of decision, notwithstanding that Louisiana law does not apply of its own force. As we have noted, the Court stated in *Little Lake Misere*, 412 U.S. at 596, that "specific aberrant or hostile state rules do not provide appropriate standards for federal law." The Court asserted that, at the very least, state law should not be borrowed as the rule of decision where doing so would deprive the government of a bargained-for contractual interest. *Id*. at 597.

We elaborated on *Little Lake Misere* in *Central Pines*, stating that we

begin with the premise that state law should supply the federal rule unless there is an expression of legislative intent to the contrary, or, failing that, a showing that state law conflicts significantly with any federal interests or policies present in this case. Refusing to apply state law is appropriate when national uniformity is required, as well as when state law conflicts with federal interests. The application of state law may in some cases so strongly conflict with federal interests that it can be rejected without further analysis. However, if state law only arguably interferes with federal interests, then the state's interests in application of its own rules must be weighed.

*Cent. Pines*, 274 F.3d at 890. We added that the government's interest in the application of the default prescription rules in place at the time of contracting, while not as strong as a bargained-for contractual interest, is nevertheless strong enough to militate against application of a revised state law rule that would deprive the government of that "expectancy interest." *Id*. at 891.

The relevant state law did not change between the time the settlement agreement was reached and the filing of the servitude owners' lawsuit. As far as this litigation is concerned, mineral royalties have always been separately prescriptible under Louisiana law. The gov-

ernment therefore does not have the kind of expectancy interest that was relevant in *Central Pines*. Indeed, with respect to land acquisition contracts the United States entered into *after* passage of Act 315, *Central Pines* holds that "Act 315 provides the background rule that the United States bargained under. Without 'significant conflict' between the application of state law and the federal interest asserted, state law should be borrowed as the rule of decision." *Id.* at 892-93.

Crucially for this case, *Central Pines* goes on to state that the government's mere "interest in adding funds to the Treasury" is not significant enough to bar the borrowing of state law. *Id.* at 893. Thus, the fact that cutting off the royalty right of the United States could diminish the amount of money flowing into its coffers is not a sufficient reason for refusing to borrow the prescription regime of the Louisiana Mineral Code as the rule of decision.[8]

To avoid the application of state law, then, the government must show that it contracted around the Louisiana Mineral Code in the settlement agreement and act of conveyance to create a mineral royalty that is not prescriptible

separately from the underlying servitudes.[9] If the government did so, it has a bargained-for contractual interest in a royalty not separately prescriptible that, per *Little Lake Misere*, contrary state law cannot abrogate.[10]

The government points to two persuasive pieces of evidence in the settlement agreement and act of conveyance that indicate an intent to avoid application of Louisiana law with respect to the royalty right. First, the granting clause of the act of conveyance states that "the rights herein conveyed" are given to the United States and its "successors or assigns forever." A grant to an individual or entity and its "successors or assigns forever" is a legal term of art that establishes that the object or interest is conveyed absolutely and unconditionally.[11] Of course, a mineral royalty is by its

---

[8] Under the Refuge Revenue Act, 16 U.S.C. § 715s, if the United States receives proceeds from the royalty, those proceeds would be set aside in a fund, most of which would ultimately be paid over to Cameron Parish. The Parish would then distribute the funds to affected local governments to offset property taxes lost as a result of the existence of the Lacassine National Wildlife Refuge. The fact that the United States has determined that the best use of mineral royalty proceeds is obtained by paying such proceeds over to local governments does not change our analysis in any way.

[9] Based on *Little Lake Misere* and *Central Pines*, we must conclude that state law provides a default regime. Absent a relevant intervening change in state law, state law is presumed to provide the operative federal rule of decision unless the parties opt out of it.

[10] As we have said, Louisiana law does not allow parties to extend or contractually to obliterate statutory rules of prescription. Under this prong of the *Little Lake Misere* analysis, however, Louisiana law would not operate of its own force. Rather, it would be used only as a "borrowed" federal rule of decision where it is not in conflict with federal interests. If the federal government contracted for a royalty that is not separately prescriptible, Louisiana's rules of prescription would be in conflict with that contractual interest and therefore could not be borrowed as the federal rule of decision.

[11] *Cf. Porter v. Acadia-Vermilion Irrigation Co.*, 479 So. 2d 1003, 1008 (La. App. 3d Cir. 1985) (stating that "according to settled jurispru-
(continued...)

nature an interest inferior to fee simple, or "perfect," title in land. Nevertheless, the use of traditional fee simple language in the granting clause indicates that the royalty conveyed to the United States was meant to endure as long as possible—in other words, as long as the servitude to which it was attached survives.[12]

Second, as part of the settlement, the parties explicitly agreed that Louisiana law, Act 315 excepted, governs the underlying servitudes. Language adopting Louisiana law as controlling is absent from the sections of the agreement that deal with the royalty right. Standing alone, this silence does not prevent us from nevertheless borrowing state law as the rule of decision with regard to the prescriptibility of the royalty. Taken in conjunction with the granting clause, however, that silence is indicative of an intent to opt out of Louisiana law.[13]

Given that the United States bargained for a royalty that is not subject to the Louisiana Mineral Code (particularly not the prescription regime of the Code), it would be inappropriate to borrow state law as the federal rule of decision. Instead, *Little Lake Misere* counsels that as a matter of federal law the government should be given the benefit of its bargain. Accordingly, the government's mineral royalty is not prescriptible separately from the Gardiner and Lacassane Servitudes, and therefore the royalty has not yet prescribed.

The judgment is REVERSED, and this matter is REMANDED for further appropriate proceedings as necessary.

---

[11](...continued)
dence . . . a grant 'forever' connotes an unlimited grant and a sale in fee simple"), *cert. denied*, 483 So. 2d 1019 (La. 1986).

[12] The language in a granting clause is not conclusive where the clause is part of a form or where there is other evidence in the contract that an unlimited grant was not intended. *See Porter*, 479 So. 2d at 1008; *City of Eunice v. Sunland Props., Inc.*, 597 So. 2d 1198, 1201 (La. App. 3d Cir. 1992). Neither of those conditions is present, however. In fact, as discussed *infra*, the language of the settlement agreement bolsters the conclusion that the granting clause in the implementing act of conveyance is significant.

[13] The government extends this argument even further, asserting not only that the parties' silence as to the applicability of Louisiana law is evidence of an intent to opt out of that law, but also that the
(continued...)

[13](...continued)
parties could not have "expected or understood" that Louisiana law would supply the rule of decision because it is uncertain what type of interests the government obtained under the relevant agreements. The government contends that it is not pointing out this supposed confusion in order to argue that its interest has not prescribed under Louisiana law (an argument it cannot make, because it stipulated prescription under Louisiana law in proceedings below), but merely to demonstrate that there could be no expectation that Louisiana law would apply if it's not even clear from the agreements what rights are at issue.

This particular argument is ineffective, because it is plain from the face of the settlement agreement and act of conveyance that the United States was given a mineral royalty, with attendant rights to bonuses and rentals, and not some sort of "special" interest undefined by Louisiana law. The act of conveyance is entitled "Act of Conveyance of Mineral Royalty Interest," and in describing the rights held by the United States, the settlement agreement and act of conveyance refer to "royalties" and "royalty interests."

EMILIO M. GARZA, Circuit Judge, dissenting in part:

I agree with the majority's conclusion that Louisiana law does not apply of its own force in this case. I also agree that Louisiana law should not be absorbed to provide the federal rule of decision if doing so would deprive the government of a bargained-for right. However, I conclude that the language of the contract itself does not reveal that the parties intended to contract around Louisiana law with respect to the government's mineral royalty in the Lacassane and Gardiner servitudes. Accordingly, I would remand the case to the district court for additional fact finding on that issue.

The majority tacitly invokes the principle of "inclusio unius est exclusio alterius," reasoning that the inclusion of a choice-of-law provision with respect to a specific portion of a contract indicates an intent that the same law does not govern the remainder of the contract. The choice-of-law provision in the settlement agreement at issue in this case, however, is more complex than the majority indicates. It states that the servitudes "are governed by the Louisiana Mineral Code, except as modified by this agreement and the holding of the United States Supreme Court in *United States v. Little Lake Misere Land Co.*, 412 U.S. 880 (1973) in so far as that case holds that LSA RS 9:5806 does not make the subject mineral servitudes imprescriptable." While the majority emphasizes the selection of Louisiana law, it seems that the real significance of this provision is that it clarifies where Louisiana law does *not* govern, i.e., where it conflicts with *Little Lake Misere* or where it was modified by the agreement. The choice-of-law provision is therefore equally consistent with the parties' intending Louisiana law to govern the entire arrangement, except in the one narrow area where they specified that it would not, as it is with their intending that state law would govern only the servitudes. The choice-of-law provision is therefore equivocal in supporting the conclusion that

10

the parties bargained with the understanding that Louisiana law would not apply to the United States' mineral interest.

As for the granting clause, the majority concedes that the term, "forever," used therein cannot "connote[] an unlimited grant and a sale in fee simple," as it usually does in contracts governed by Louisiana law. *Porter v. Acadia-Vermilion Irrigation Co.*, 479 So. 1003, 1008 (La. App. 3d Cir. 1985). For that reason, it is unclear what the parties intended the term to mean. While they might, as the majority concludes, have intended for the royalty to last as long as the underlying servitudes, they might have merely meant that whatever rights were conveyed in the settlement agreement were not subject to any time constraint other than those, like LA.REV. STAT. § 31:85, that define the scope of the rights themselves. The granting clause therefore does not demonstrate that the government bargained for a right that is inconsistent with the application of Louisiana law.

In this case, the district court did not make factual findings as to which law the parties intended to govern the servitudes. Because nothing in the contract affirmatively evidences the parties' intent, I would remand this case to the district court for additional fact finding. *See In re Mercer*, 246 F.3d 391, 404 (5th Cir. 2001) (remanding for further fact finding on the question of intent to deceive); *Texas Dept. of Hous. and Comm. Affairs v. Verex Assur., Inc.*, 68 F.3d 922, 931 (5th Cir. 1995) (remanding for further fact finding on the issue of mutual mistake). Accordingly, I respectfully dissent in part.