**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 14a0796n.06

No. 13-6004

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| DONNA SHERWOOD, VANCE SHERWOOD, JEROME PINN, ANTHONY BILLINGSLEY, JENNIFER PEET, RICHARD WILLIAMS, GERRY WILLIAMS, FRANK OAKBERG, BONNIE OAKBERG, THOMAS WARREN, JR., JEFFREY SEE, SHEILA BOOE, HAROLD SLOVES, and FELICITAS SLOVES, | ) ) ) ) ) ) ) ) | **FILED** Oct 22, 2014 DEBORAH S. HUNT, Clerk |
| Plaintiffs-Appellants. | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF TENNESSEE |
| v. | ) ) | |
| TENNESSEE VALLEY AUTHORITY, | ) ) | **OPINION** |
| Defendant-Appellee, | ) ) | |

**BEFORE: ROGERS and KETHLEDGE, Circuit Judges, and MALONEY, District Judge.**[*]

**PAUL MALONEY, Chief District Judge.**

The Tennessee Valley Authority (TVA) provides electric power to consumers in seven states across the Southeast. In order to reliably deliver that power, TVA maintains the vegetation under and around its power line structures. Historically, TVA has removed all trees directly under its power lines, but did not cut down all of the trees in what TVA called buffer or border zones, the edges of the easements TVA possesses. In 2012, several of the plaintiffs received notices that TVA would be removing dozens of tall, mature trees from the easements over their properties. Eventually, the plaintiffs filed this lawsuit seeking an injunction to stop the removal of the trees, and

---

[*] The Honorable Paul L. Maloney, Chief United States District Judge for the Western District of Michigan, sitting by designation.

raising a claim under the National Environmental Policy Act (NEPA).  In response to the NEPA claim, TVA filed an administrative record for the 2012 decisions made by its staff for the routine maintenance of its power lines.  In the district court and on appeal, the plaintiffs argue that TVA did not file the correct administrative record.  This Court agrees and remands the matter to the district court so that TVA can correct its error.

## I.

TVA was created by Congress in 1933, 16 U.S.C. § 831, *et seq.* (2010), and is a "wholly-owned corporate agency and instrumentality of the United States[.]" *Hill v. United States Dep't of Labor*, 65 F.3d 1331, 1333 (6th Cir. 1995).  TVA has the authority to acquire real estate, by purchase and by condemnation, for the purpose of constructing power transmission lines along the Tennessee River and its tributaries.  16 U.S.C. § 831c(h)-(i).  Rather than purchasing the property in fee simple, TVA acquired easements, securing rights to use the property for specific purposes.  TVA's easements are typically between 75 and 200 feet wide.  Built within those easements are approximately 15,900 miles of power transmission lines.  The easements cover some 260,000 acres.

In the Third Amended Complaint, the plaintiffs allege they each possess some ownership interest in real estate, and that TVA holds easements and rights-of-way over their properties.  The plaintiffs filed six easements with the complaint. R. 170-1, 170-2, 170-3, 170-4, 170-6, and 170-7.  With minor and non-material differences, in each of the easements, the then-landowners "convey unto the United States of America, a permanent easement and right-of-way, for the following purposes[.]"  First, the United States is granted "the perpetual right to enter" and "to erect, maintain, repair, rebuild, operate, and patrol" electric power transmission lines and all necessary appurtenances.  Second, the United States is granted the "right to clear said right-of-way" and keep

the right-of-way clear. All six easements list things that may be cleared. All six easements list "brush." Four of the six easements list "trees," while the other two list "timber." All six easements also grant the United States the right to remove danger trees located beyond the limits of the right-of-way. The plaintiffs also filed an easement created by the TVA through a declaration of taking. R. 170-8. The easement-by-taking is "for electric power transmission purposes," "together with the right to clear said right-of-way and keep the same clear of brush, trees, . . . ." *Id.* PgID 24511.

TVA has established a vegetation-management program for its easements. TVA maintains the easements by keeping the area beneath the transmission lines clear, while leaving a narrow buffer zone on either side of the easement. But each easement is not re-cleared every year. TVA's power transmission lines have been divided into multiple sectors, and each sector is managed by a right-of-way specialist. The sectors are on five-year cycles for tree removal and three-year cycles for mowing or spraying the undergrowth. In the 1997 and 2008 Line Maintenance Manuals, TVA states that "[t]all growing trees on TVA ROW [(right-of-way)] will be cut. Low-growing trees, shrubs, hedges, etc., may be allowed to remain on the ROW provided they are not hazardous or detrimental to maintenance." R. 50-1 PgID 1474 (2008); R. 50-3 PgID 1482 (1997). The phrases "tall growing trees" and "low growing trees" are not defined. However, the 2008 Line Maintenance Manual establishes that the minimum distance between a tree or part of a tree and a line conductor for power lines over 200 kV is 10 feet.[1] R. 50-1 PgID 1470.

Although the TVA has been maintaining the vegetation in its easements for more than seventy years, it has not removed all of the taller, mature trees located within its rights-of-way. The

---

[1] When a transmission lines comes within close proximity of a tree or other vegetation, it risks a "flashover," an electrical arc or discharge from the power structure to the tree. For high voltage lines, flashovers can occur from as far away as ten feet. Regg Dec. R. 50 PgID 1457.

right-of-way specialists have been afforded discretion in deciding which, if any, trees to remove. Budget constraints have further restricted the discretion afforded the specialists. As a result, many tall trees remain standing within TVA's easements. TVA concedes that the "low-growing trees" policy "was sometimes not strictly followed[.]" Regg Dec. R. 50 PgID 1457. TVA has also made exceptions when landowners have promised to control the height of the trees. *Id.* PgID 1458.

In recent years, the wisdom of allowing these taller trees to grow within electric transmission line easements was called into question. In August 2003, approximately 50 million people in the Midwest and Northeast portions of the United States suffered a power outage for up to two days. It was later determined that the blackout was caused by a tree that came into contact with power lines. This event set in motion a review of transmission line maintenance programs. According to several documents in the record, in 2007, the North American Electric Reliability Corporation (NERC), a government-certified industry organization that sets reliability standards for the transmission of electricity, established rules for vegetation management around electric transmission lines.[2]

According to public statements made by TVA, TVA altered its vegetation-management practices in order to comply with the new NERC rules and to avoid paying fines and penalties. Although the new rules apply only to transmission lines carrying a specific voltage and higher, TVA opted to apply the rules uniformly to all of its transmission line easements. The justification for the change, and the contents of this revised approach to vegetation management, were summarized in

---

[2]The NERC's Transmission Vegetation Management Program (TVMP), FAC-003-1, became effective April 7, 2006. R. 170-27 PgID 24537. The program requires transmission line owners to prepare and keep current a formal transmission vegetation-management program.

a March 2012 letter authored by Robin Manning, executive vice president and chief energy transmission officer for TVA.

> Inadequate right-of-way maintenance activities have led to utilities being fined by NERC and FERC, typically in the hundreds of thousands of dollars, with other remediation costing millions of dollars. These additional actions are a consequence of the 2003 blackout.
>
> In designing a transmission line vegetation maintenance program that addresses the concerns raised by NERC and FERC, TVA has implemented a program that reduces the risk of trees contacting the transmission lines, which helps maintain public safety and system reliability, and avoids potential financial penalties. Our policy requires TVA to cut down all trees 15 feet or higher or ones that have the potential to grow taller than 15 feet, to ensure power lines are not affected.
>
> Although there are some utilities that allow the planting of taller trees within the right-of-way, it is generally not compatible with high reliability. Expensive maintenance programs are needed to manage taller-growing trees. The frequent pruning encourages rapid regrowth, and trees that need to be managed can easily be overlooked in a system as large as TVA's with almost 16,000 miles of transmission line.
>
> It is important that TVA can be penalized, as much as $1 million for each day we allow even a single tree to encroach with in a specified distance of power lines. Therefore, TVA has adopted an aggressive vegetation management program based on the wire zone/border zone method (see attached document entitled "Understanding TVA's Transmission Vegetation Management").
>
> - TVA may allow low-growing species (less than 15 feet at mature height) to be planted in the border zone (within the right-of-way, but not directly under transmission structures or conductors) next to transmission lines, but express TVA approval is required in each case. However, narrow rights-of-way or easements may not allow for a border zone.
> - TVA no longer allows taller, incompatible (species that exceed 15 feet mature height) trees within its rights-of-way when requested, even if landowners say they will control tree height.
> - TVA is removing, sometimes extensively, incompatible species from its rights-of-way.

R. 170-28 PgID 24542-43.

Other documents in the record support the conclusion that TVA recently altered its vegetation-management practices. In 2012, TVA placed a document on its website titled "Why TVA Has Changed the Way It Manages Vegetation in Its Transmission Rights of Way?" R. 29-5 PgID 510-11. When TVA made a decision to remove trees from within its easements, TVA would give the property owner a letter and would attach the same information that was posted to the website. R. 23-8 PgID 403-04. Although the two documents are formatted differently, the content of the two documents is identical, and both include language similar to that found in Manning's letter. TVA states it has "implemented a more aggressive transmission right of way vegetation management program involving removal of incompatible plants from the rights of way." R. 23-8 PgID 404. TVA explained that it "may allow low-growing plant species (less than 15 feet at mature height) to be planted in the border zone[s,]" and that it "would no longer allow taller, incompatible trees within its rights of way when requested, even if landowners say that they will control tree height." *Id.*

In newspaper articles published in 2012 covering TVA's decisions to remove trees under its new approach to vegetation management, other spokespersons for TVA made similar comments. In the Times-Journal, a newspaper based in Fort Payne, Alabama, TVA's Travis Brickley states that TVA has a "zero tolerance policy," explaining that "we're going to remove trees that can grow 15 feet or more. We're also going to clear the full width of the easement." R. 21-37 PgID 386. In the Times Free Press, a newspaper based in Chattanooga, Tennessee, TVA's Jason Regg calls the change to vegetation management a "reclamation of the full easement" and that the approach is "more aggressive now than in the past." R. 21-27 PgID 358. In an article printed in the Johnson

6

City Press, another newspaper based in Tennessee, Regg describes TVA's action as "a widening initiative on all our transmission system[.]" R. 21-6 PgID 319.

In the Third Amended Compliant, the plaintiffs allege TVA has a new policy or practice which will result in the removal of millions of taller, older, mature trees from TVA's rights-of-way. The plaintiffs contend these trees were left standing when TVA initially cleared the rights-of-way and constructed its electric transmission lines. The plaintiffs refer to the new policy or practice as the "15-foot rule," based on statements made by TVA agents and also in TVA literature. More specifically, TVA intends on removing from its easements all trees that are taller than fifteen feet, or will mature at a height greater than fifteen feet. The plaintiffs assert TVA failed to conduct the required NEPA studies before implementing this new rule. The plaintiffs have submitted evidence showing that TVA identified more than 200 trees for removal from plaintiffs' properties. The plaintiffs also submitted evidence identifying tracts of land where hundreds of trees would have to be removed if TVA were to strictly enforce the 15-foot rule for its easements. The plaintiffs have also submitted some evidence of the potential environmental consequences of the removal of tall, mature trees from the easements.

The district court ultimately dismissed all of the claims brought by the plaintiffs. The district court granted TVA's motion to dismiss the plaintiffs' claim that TVA had exceeded the scope of the easements. *Sherwood v. TVA*, 925 F.Supp.2d 906, 917-19 (E.D. Tenn. 2013) ("*Sherwood I*"). In that opinion, the district court denied the plaintiffs' motion to certify a question to the Tennessee Supreme Court. *Id.* at 916-17. The district court also granted TVA's motion for summary judgment. *Sherwood v. TVA*, 956 F.Supp.2d 856, 872 (E.D. Tenn. 2013) ("*Sherwood II*"). The district court also concluded that the administrative record submitted by TVA should be expanded, and that the

7

record provided sufficient information for the court to determine whether TVA's decision was arbitrary and capricious. *Id.* at 864. After reviewing the record, the district court held that TVA had not established a new policy, and was acting consistent with the maintenance policy that had been in place for the past fifteen years. *Id.* at 866-67. Finally, the district court held that TVA's 2012 vegetation-maintenance policy was not arbitrary or capricious. *Id.* at 868-72.

The plaintiffs appealed the district court's decisions. First, the plaintiffs request that this Court certify a question of state property law to the Tennessee Supreme Court. Second, the plaintiffs appeal the Rule 12(b)(6) dismissal of their breach of easement claim. Third, the plaintiffs appeal the determination that TVA submitted the proper administrative record. Finally, the plaintiffs appeal the Rule 56 dismissal of their NEPA claim.

## II.

In *Sherwood II*, the district court dismissed all of the plaintiffs' NEPA-related claims on TVA's motion for summary judgment. Summary judgment rulings are reviewed de novo, while applying the appropriate standard of review to an agency's decision. *Schuck v. Frank*, 27 F.3d 194, 197 (6th Cir. 1994). Claims brought under NEPA are reviewed under the standard provided by the Administrative Procedure Act (APA). *Sierra Club v. Slater*, 120 F.3d 623, 630-31 (6th Cir. 1997). Under the APA, a court may set aside an agency's final decision if the decision is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. 5 U.S.C. § 706(2)(A) (2007); *Slater*, 120 F.3d at 632.

NEPA, 42 U.S.C. § 4321 *et seq.* (2012), requires federal agencies to consider the significant environmental effects of a proposed action. *Baltimore Gas and Elec. Co. v. NRDC, Inc.*, 462 U.S. 87, 97 (1983) (citation omitted); *see Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976)

8

(explaining that the agencies must take a "hard look" at environmental consequences). "[I]t is now well settled that NEPA itself does not mandate particular results, but simply prescribes the necessary process." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). Where other federal statutes might impose results-oriented environmental obligations, "NEPA merely prohibits uninformed - rather than unwise - agency action." *Id.* at 351.

Not every action by a federal agency requires a NEPA study. The statute requires an environmental inquiry for "major Federal actions." 42 U.S.C. § 4332(2)(C). For all major federal actions significantly affecting the quality of the human environment, NEPA requires federal agencies to prepare an environmental impact statement (EIS) for the proposed action. *Slater*, 120 F.3d at 628. NEPA regulations define "major federal action" broadly: "Major Federal action includes actions with effects that may be major and which are potentially subject to Federal control and responsibility." 40 C.F.R. § 1508.18. Actions include both new and continuing activities and new or revised agency rules, plans, policies, and procedures. *Id.* § 1508.18(a). When the agency is not sure if a proposed action will significantly affect the quality of the human environment, the agency may opt to complete an environmental assessment (EA), a preliminary document in which the agency gathers sufficient data and analyzes it to determine whether to prepare an EIS or issue a finding of no significant impact (FONSI). 40 C.F.R. §§ 1501.4(c) and 1508.9; *see Charter Twp. of Huron, Michigan v. Richards*, 997 F.2d 1168, 1174 (6th Cir. 1993) ("An EA is not a definitive document for purposes of compliance with NEPA. Rather, it is a first step, which results in a decision with regard to the next step.").

9

Alternatively, NEPA regulations allow federal agencies to identify classes of actions that do not require either an EIS or an EA. 40 C.F.R. § 1507.3(b). Such classes or categories of actions are known as categorical exclusions (CE). A categorical exclusion is

> a category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of these regulations (§ 1507.3) and for which, therefore, neither an environmental assessment nor an environmental impact statement is required. An agency may decide in its procedures or otherwise, to prepare environmental assessments for the reasons stated in § 1508.9 even though it is not required to do so. Any procedures under this section shall provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect.

*Id.* § 1508.4. To establish a CE, regulations require the agency to publish the proposed CE in the Federal Register, provide an opportunity for public comment, and submit the CE to the Council on Environmental Quality for review and approval. 40 C.F.R. § 1507.3(a). TVA has adopted twenty-eight CEs, which are identified in § 5.2 of TVA's Procedures for Compliance with the National Environmental Policy Act. R. 49-1 PgID 1437-38. Included among the twenty-eight CEs is the routine operation, maintenance, and minor upgrading of existing TVA facilities.

TVA submitted, as the designated administrative record, the thirteen 2012 CEs created for the routine maintenance of the thirteen sectors of its electric transmission lines. In its discretion, the district court expanded the record to allow the deposition of John Hardyman, and also to allow the admission of certain documents in existence at the time TVA made its decision. As described by the district court, TVA carefully considered whether the right-of-way re-clearing for 2012 fell within the CE for routine maintenance. *Sherwood II*, 956 F.Supp.2d at 866-67. The district court concluded that TVA had not instituted a new policy and that the 2012 re-clearing was consistent with the maintenance guidelines used over the past fifteen years. *Id.* In a footnote, the district court

10

explained that "the issue is not whether TVA performed an environmental review of the fifteen-foot rule; rather, the issue is whether TVA's determination that the 2012 vegetation-management project qualified for the CE for routine maintenance was arbitrary and capricious." *Id.* at 866 n.3.

Because NEPA primarily imposes procedural requirements on agencies, rather than environmental outcomes, a NEPA lawsuit is "inherently a challenge to the adequacy of the administrative record." *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 201 (4th Cir. 2009) (citing *Suffolk Cnty. v. Sec'y of the Interior*, 562 F.2d 1368, 1384 (2d Cir. 1977)). A reviewing court will not substitute its judgment of the environmental impact for the judgment of the agency when the agency has adequately studied the issue. *Kelley v. Selin*, 42 F.3d 1501, 1518 (6th Cir. 1995). "However, we will 'determine whether the agency has, in fact, adequately studied the issue and taken a 'hard look' at the environmental consequences of its decision.'" *Id.* at 1518-19 (quoting *Crounse Corp. v. I.C.C.*, 781 F.2d 1176, 1193 (6th Cir. 1986)). "Once an agency establishes categorical exclusions, its decision to classify a proposed action as falling within a particular categorical exclusion will be set aside only if a court determines that the decision was arbitrary and capricious." *Citizens' Comm. to Save Our Canyons v. United States Forest Serv.*, 297 F.3d 1012, 1023 (10th Cir. 2002) (collecting cases). A decision is arbitrary and capricious if the agency has "(1) relied on factors which Congress has not intended it to consider, (2) entirely failed to consider an important aspect of the problem, (3) offered an explanation for its decision that runs counter to the evidence before the agency, or (4) is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Northwoods Wilderness Recovery, Inc. v. United States Dep't of Agric. Forest Serv.*, 192 F.App'x 369, 374 (6th Cir. 2006) (quoting *Henry Ford Health Sys. v. Shalala*, 233 F.3d 907, 911 (6th Cir. 2000)) (internal quotation marks omitted).

11

On the case presented by the plaintiffs, the record underlying the 2012 CE is not the record for TVA's 15-foot rule. John Hardyman prepared the 2012 CE for the Knoxville sector of TVA's transmission lines. In his deposition, Hardyman testified that, as far as he knew, the specific maintenance decisions for mowing, herbicide application, and the like, were left to the discretion of the specialist and those decisions would have been made in the same manner as had been done in the past. R. 191-1 PgID 24770. Hardyman also testified that he did not know how many trees would be removed as part of the 2012 maintenance on the Knoxville sector, and he had no idea how that number would compare to previous years. *Id.* PgID 24770. Hardyman was asked several times about the 15-foot rule, of which he acknowledged awareness. *Id.* PgID 24768. Hardyman testified that the rule "had no bearing" on the CE because the decision to cut down any tree is always left to the discretion of the specialist, so long as the decision does not conflict with any restrictions that might apply. *Id.* PgID 24776.

The 2012 CEs do not reflect consideration of the environmental consequences of changes in TVA's vegetation-management practices, in particular the 15-foot rule. Quite the opposite, the individuals who write the CEs assume that following TVA's vegetation-management practices will avoid environmental consequences. Hardyman was quite clear. Through the CE, he can place restrictions on the specialist, who then makes maintenance decisions following TVA's best management practices. R. 191-1 PgID 24776. Thus, a particular CE allows for tree removal within that sector as a part of routine maintenance without a significant environmental consequence, so long as the removal of those trees complies with TVA's best management practices. That determination would likely be afforded deference by a reviewing court if the NEPA challenge was limited to the decision to remove the trees on the plaintiffs' properties. But that is not the NEPA claim asserted

12

in the complaint. The complaint asserts that a specific alteration of the management practices should have been subjected to a NEPA review. In this case, the use of the 2012 CE as the NEPA review amounts to circular reasoning. When the CE author *assumes* that the use of the management practices, including the 15-foot rule, will minimize the environmental consequences, TVA cannot use the CE to *establish* that the challenged management practice will not have environmental consequences.

The evidence in the record before the district court, but not contained in the administrative record submitted by the agency, reinforces this conclusion. Absent clear evidence to the contrary, the reviewing court assumes the agency has properly designated the administrative record. *BAR MK Ranches v. Yuetter*, 994 F.2d 735, 740 (10th Cir. 1993). The plaintiffs have presented clear evidence that TVA has not designated the proper administrative record. The Third Amended Complaint makes clear that the plaintiffs have challenged TVA's 15-foot rule. The evidence in the record before the district court establishes that TVA now enforces a 15-foot policy in its easements. In his letter, Manning stated "[o]ur policy requires TVA to cut down all trees 15 feet or higher[.]" In one of the newspaper articles, Brickley referred to the "zero tolerance policy" when referring to trees over 15 feet. Although consistent with its rights in the easements, the 15-foot rule is inconsistent with TVA's historic policy of giving specialists discretion to remove trees and the exceptions that TVA has made in the past.

Faced with public statements made by TVA spokespersons, and in light of the decision to remove dozens of trees from the plaintiffs' properties, TVA was unpersuasive and when it argued to the district court that "media reports and public statements from some TVA officials have conveyed the misimpression that TVA has adopted a 'new policy' with respect to ROW reclearing

13

maintenance." R. 18 PgID 240. TVA argued and convinced the district court that its vegetation-maintenance practices were summarized in the 2008 Line Maintenance Guidelines, which had not materially altered the relevant guidelines from 1997. The documents TVA placed on its website and distributed to landowners in 2012, as well as letters sent by TVA officials and statements made by TVA spokespersons to the media, contradict this conclusion. In an effort to avoid fines and penalties from government and industry regulators, TVA altered its vegetation maintenance policies *after* 2008. TVA has not submitted *any* documentation showing that it studied the possible environmental effects of imposing a 15-foot rule on its 260,000 acres of easements. The plaintiffs have submitted some evidence indicating that the new approach is causing widespread removal of taller, mature trees that TVA had previously allowed to grow within the easements.

We cannot tell from the administrative record submitted by TVA, whether TVA has taken a "hard look" at the environmental consequences of the *alterations* made to its vegetation maintenance policies. New or revised agency rules may constitute "major federal actions" under NEPA. 40 C.F.R. § 1508.18(a) In the past, TVA has given the right-of-way specialists discretion to remove, or not remove, trees within the border zones. The new rule appears to eliminate that discretion. The new rule appears to impose an objective measurement of which trees to remove; rather than permitting the undefined "low growing trees," and allowing discretion by the specialists, those specialists are now required to remove all trees within the easement exceeding 15 feet in height. TVA also increased the budget "to allow for reclearing the width of the ROWs[,]" thus removing another earlier limitation on the specialists' ability to remove trees. Regg Dec. R. 50 PgID 1455 and 1457. Under the new rule, specialists can no longer avoid removing a tree when the land owner promises to bear the cost of trimming and pruning the tree. Parlance from the timber industry

14

illuminates the distinction.  Under the old rule, specialists were allowed to selectively harvest trees.

Under the new rule, specialists clear cut trees.  The new policy is thus not a mere continuation of

past vegetation-management practices.

**III.**

The plaintiffs request the following question be certified to the Tennessee Supreme Court:

> Whether, pursuant to the grants of easement by the plaintiffs' predecessors in
> interest, TVA has the right to remove trees in its right-of-way that do not interfere
> with or endanger the transmission lines?

The plaintiffs made the same request to the district court, which denied the motion to certify.  *See*

*Sherwood I*, 925 F.Supp.2d at 916-17.  A district court's decision to deny a motion to certify is

reviewed for an abuse of discretion.  *Pennington v. State Farm Mut. Auto. Ins. Co.*, 553 F.3d 447,

449-50 (6th Cir. 2009).  Tennessee Supreme Court Rule 23 allows a federal court to certify a

question when Tennessee law "will be determinative of the cause" and when the certifying court

concludes "there is no controlling precedent in the decisions of the Supreme Court of Tennessee."

Certification of a question of law to that state's supreme court "is most appropriate when the

question is new and the state law is unsettled." *Pennington*, 553 F.3d at 450 (quoting *Transamerica*

*Ins. Co. v. Duro Bag Mfg. Co.*, 50 F.3d 370, 372 (6th Cir. 1995)).  The district court denied the

plaintiffs' motion to certify for two reasons.  First, the district court concluded that federal law, not

Tennessee law applied.  *Sherwood I*, 925 F.Supp.2d at 916-17.  Second, the district court found the

proposed question for certification was definitively resolved by an unpublished decision issued by

the Tennessee Court of Appeals, which relied upon an opinion issued by the Tennessee Supreme

Court.  *Id.* at 917.  The district court did not abuse its discretion in declining to certify the question

to the Tennessee Supreme Court.

15

Because federal interests are sufficiently high in this matter, the easements are governed by federal law, not state law. Ordinarily, property rights are defined by and governed by state law. *See Columbia Gas Transmission Corp. v. Exclusive Natural Gas Storage Easement*, 962 F.2d 1192, 1198 (6th Cir. 1992). However, when the United States is a party to a lawsuit, and the underlying activities arise from a federal program, the federal interests implicated may warrant the protection of federal law. *See Empire Healthchoice Assurance, Inc. v. McVeigh*, 547 U.S. 667, 690-91 (2006); *Boyle v. United Techs. Corp.*, 487 U.S. 500, 504 (1988); *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 726-27 (1979); *United States v. Little Lake Misere Land Co., Inc.*, 412 U.S. 580, 592-93 (1973); *Clearfield Trust Co. v. United States*, 318 U.S. 363, 366 (1943). The federal interests involved here are sufficiently high that federal common law governs, although the federal law may in turn adopt Tennessee law. *See Lake Misere*, 412 U.S. at 594-96. Through the TVA, the United States is a party to this lawsuit. The question posed concerns the scope of the property interests of the United States. Those interests, the easements and rights-of-way, were acquired under the authority of a federal statute. Because TVA has acquired easements across seven states for the purpose of erecting and transmitting electric power, the United States has an interest in a uniform approach to the property rights in those easements.

Even if federal law incorporates Tennessee law in this case, Tennessee law regarding easements is not so unsettled as to warrant certification. *See Keenan v. Fodor*, Nos. M2012-00330-COA-R3-CV, M2012-02623-COA-R3-CV, 2014 WL 793713, at *7 (Tenn. Ct. App. Feb. 26, 2014) ("It is well-settled that, because an easement is limited to the purposes for which it was created, an owner of an easement 'cannot materially increase the burden of it upon the servient estate or impose thereon a new and additional burden.'") (quoting *Adams v. Winnett*, 156 S.W.2d 353, 357 (Tenn.

16

Ct. App. 1941)); *Sellick v. Miller*, 301 S.W.3d 636, 640 (Tenn. Ct. App. 2009) (resolving whether an easement was transferrable and holding that "[t]he rules concerning the interpretation of deeds are well-settled") (citation omitted). There was no obligation on the district court, and there exists no obligation on our court, to resort to certification merely because such a course is available. *See Lehman Bros. v. Schein*, 416 U.S. 386, 390-91 (1974).

**IV.**

The plaintiffs insist that TVA has exceeded the scope of its easements by removing the existing mature trees. The district court granted TVA's motion to dismiss, concluding that TVA was acting within the scope of its easements. The district court held that the unambiguous language in the easements gave TVA the perpetual right to remove trees. *Sherwood I*, 925 F.Supp.2d at 918. The district court's dismissal for failure to state a claim under Rule 12(b)(6) is reviewed de novo. *Shuler v. Garrett*, 743 F.3d 170, 172 (6th Cir. 2012). We agree with the district court.

The easements give TVA the right to clear trees from its rights-of-way. Although federal law applies, federal courts may give substance to the federal common law by looking to state law, which may be borrowed so long as it does not frustrate the federal interests at stake. *See Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 98 (1991); *Little Lake Misere Land Co.*, 412 U.S. at 594-96. Under Tennessee law, the scope of an easement created by a grant is determined by the language of the grant. *Foshee v. Brigman*, 129 S.W.2d 207, 208 (Tenn. 1939). Furthermore, where the language of the grant creating the easement is not ambiguous, the "easement specific in its terms is decisive of its limits." *Cellco P'ship v. Shelby Cnty.*, 172 S.W.3d 574, 594 (Tenn. Ct. App. 2005) (citation and quotation marks omitted). The easements involved here unambiguously give the United States three rights: (1) the right to enter and to construct electric transmission line structures,

17

(2) the right to clear the easements of brush, trees, and timber, and (3) the right to remove danger trees from the surrounding land. In describing the rights granted, the easements use the plural "purposes," not the singular "purpose."

The plaintiffs reason that the primary purpose of the easement is the construction of power lines and, under Tennessee law, secondary or subservient purposes should not be enforced against the landowner's wishes. Other than the order of the purposes listed in the grant, nothing suggests that one purpose is subservient to the other. Of course, in order to construct the transmission lines, the easements must first be cleared of trees. Nothing in the language of the easement, explicitly or implicitly, limits the right to clear trees from the right-of-way.

## V.

Because the administrative record submitted by TVA did not consider the environmental consequences of the 15-foot rule, this matter must be remanded to the district court. The complaint challenged more than TVA's decision to remove trees as part of the routine maintenance of its easements. The complaint alleged that TVA's alteration of its vegetation-maintenance practice – the removal of all trees over 15 feet, as well as those trees that will grow to a height over fifteen feet – constitutes a major federal action under NEPA. The TVA must compile the administrative record for the decision made that is challenged by the plaintiffs, in order for the court to evaluate the decision's propriety under NEPA. *See Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 419-21 (1971). Therefore, the matter must be remanded for the TVA to submit the proper administrative record to the district court. For the NEPA claim, the district court is **REVERSED.**

18

With respect to the certification of a question to the Tennessee Supreme Court and the breach of easement claims, the district court is **AFFIRMED.**